KRAUSE, ADMR.; APPELLANT, *v.* THE STATE OF OHIO, APPELLEE.

2

(No. 30880—Decided September 30, 1971.)

*Messrs. Sindell, Sindell, Bourne, Markus, Stern & Spero,* and *Mr. Steven A. Sindell,* for appellant.
*Mr. William J. Brown,* attorney general, *Mr. Charles E. Brown* and *Mr. Julius J. Nemeth,* for appellee.

DAY, C. J. This case comes here after a motion to quash was sustained and judgment for the defendant entered in the trial court. Appellant filed timely notice of appeal.

Appellant assigns one error, in effect, and states the claimed, controlling proposition of law in these terms:

"Where agents, servants and employees of the state of Ohio commit negligence, carelessness, and wanton and reckless misconduct as a result of which injury and death occur to an innocent victim, the heirs and estate of that victim have the right to recover damages against the state of Ohio, and such action is not barred by the doctrine of sovereign immunity which is invalid and unconstitutional."

The underlying contention in the appellant's proposition of law has two branches; first, the doctrine of sovereign immunity violates equal protection of law because it establishes two categories of claimants, those offended by state action and those offended by private action, with dif-

ferent protections but without a foundation in reasonableness.

Second, the doctrine of sovereign immunity, if not foreign to American jurisprudence, is judge-made in this jurisdiction, and can be unmade under the same auspice.

The state argues that it has not consented to be sued for the alleged carelessness, negligence, reckless and wanton misconduct of its agents and employees when the appellant's decedent, Allison Krause, was killed on May 4, 1970, and that, therefore, the doctrine of sovereign immunity insulates it and its agents from response to law.

*I.*

The article and section of the Ohio Constitution relevant to governmental immunity provides:

Article I, Section 16:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.

"[Suits against the state.] Suits may be brought against the state, in such courts and in such manner, as may be provided by law. (As amended September 3, 1912.)"

The Supreme Court of Ohio interpreting the 1912 amendment held, in 1917, that it was not self-executing and required legislative authority by statute as a prerequisite to suit. *Raudabaugh* v. *Ohio* and *Palmer* v. *Ohio* (1917), 96 Ohio St. 513, 518. The Ohio conclusion relied heavily upon a since discarded California interpretation of a comparable constitutional provision (see III below) and made no reference to a revealing constitutional history. Had the history of the amendment in the 1912 convention been considered, an entirely different conclusion probably would have been reached[1] on the non-self-executing issue.

---

[1] Supporting the Amendment Mr. B. F. Weybrecht, delegate from Stark County, said: "* * * in its denial of the old-time notion that the state or sovereign can not be amenable to the suit of a citizen without its consent, it is in line with the recommendation of constitutional writers for the past sixty years and in accord with the practice that during the same time obtains in every European country, with the possible exception of Russia." * * * "Why should the humble claimant against

4

A reader approaching Section 16 for the first time, without preconceptions engendered by *Raudabough* v. *Ohio* and *Palmer* v. *Ohio, id.,* could certainly conclude that the constitutional provision was intended to jettison the concept of sovereign immunity in Ohio if it ever existed. However, as an intermediate Court of Appeals we must read the section in the light of our highest court's interpretation and we do so. Nonetheless, it occurs to us that a reading fifty-four years old might yield to a different view if the section were re-read by contemporary light.[2]

the state be obliged to abjectly supplicate the legislature for the privilege of entering the court of justice?" * * * "Let the state exemplify by this constitutional provision her willingness to submit to every enactment she imposes on the citizen. Let the state indicate by the adoption of this proposal that the same restrictions—the demands of the industrial establishments within her borders—must apply to the numerous charitable and penal institutions under her management. The thousands of employes in these institutions are entitled to the same protection of life and limb in their various avocations—many of them hazardous —as are the workmen in any manufacturing plant in the state, and, in case of injury, to just compensation determined after a fair and impartial trial, and not as such cases are usually disposed of by the legislature—a settlement based upon charity and doubt." * * * "If we want to get the government back to the people, make it responsive to their ideals of equal and exact justice. Let the humblest citizen feel that while the state can impose on him all the duties of citizenship, taxation, obedience to law and the common defense, he is the equal of the sovereign before the law." Volume 2, Proceedings and Debates of the Constitutional Convention of the state of Ohio, 1431 (1912). The traditional argument that the state would be overwhelmed by suits was strongly made in opposition to the Amendment. Immediately thereafter the record shows overwhelming adoption by a vote of 71 to 12, *id.* at 1919. The progeny of the *Raudabaugh-Palmer* reading take little or no account of the constitutional history. See *State, ex rel. Williams,* v. *Glander* (1947), 148 Ohio St. 188, 194, 207; *Wolf* v. *Ohio State Univ. Hosp.* (1959), 170 Ohio St. 49, 51-54; *Schaffer* v. *Board of Trustees* (1960), 171 Ohio St. 228, 229-230; *Wilson* v. *Cincinnati* (1961), 172 Ohio St. 303, 304; *Hack* v. *Salem* (1963), 174 Ohio St. 383, 384 *et seq.*; *Moloney* v. *Columbus* (1965), 2 Ohio St. 2d 213, 215 *et seq.*, cf. For a critical assay of sovereign immunity see Comment—*Ohio Sovereign Immunity: Long Lives the King,* 28 Ohio St. L. J. 75 (1967); Editorial Note—*Claims against the State of Ohio: The Need for Reform,* 36 Cinn. L. Rev. 239. (1967).

[2]Such a suggestion is not unknown in Ohio judicial experience, see *Smith* v. *Flesher* (1967), 12 Ohio St. 2d 107, 109.

For other reasons, however, we conclude that notwithstanding *Raudabaugh-Palmer,* the immunity is no longer viable. We reverse.

## II.

In the face of the *Raudabaugh-Palmer* decision, the Legislature has enacted and re-enacted statutes from which it is adducible that the state has waived immunity. This follows from the consideration of the language in the second paragraph of Section 16, Article I—

"Suits may be brought against the state, in such courts and in such manner, as may be provided by law."— in conjunction with the general procedural statutes of the state. For those statutes have long provided, with no exceptions for tortious state conduct, that:

"The Court of Common Pleas has original jurisdiction in all civil cases * * *." R. C. 2305.01.

and

"An action is an ordinary proceeding in a court of justice, involving process, pleadings, and ending in a judgment or decree, by which a party prosecutes another for the redress of a legal wrong, enforcement of a legal right, or the punishment of a public offense." R. C. 2307.01.[3]

These examples of the general treatment of *all* causes of action, without a distinction or exception to support the vitality of sovereign immunity, could be extended. However, the examples sufficiently make the point that the omnibus language of the procedural statutes effects compliance with the constitutional invitation to allow suits "in such manner, as may be provided by law" nothing appearing to the contrary.

## III.

Governmental immunity is an anachronism. It represents a vestige of the ancient apotheosis of the state in the person of a king. That the king can do no wrong[4] is a dub-

---

[3] The new Ohio Rules for Civil Procedure do nothing to change the thrust of the policy implicit in these statutes.

[4] It has been suggested that the original meaning of the maxim was merely that the king was not privileged to do wrong. See Borchard, Governmental Liability in Tort, 34 Yale L. J. 1 (1924), fn. 2 at p. 2. Professor Borchard saw the difficulty with the problem as

ious concept in a nation whose very founding repudiated kings. Discussions of such immunity begin with the idea of protecting acts of a state[6] (something greater than the sum of its citizens) and finish by shielding the wrongful acts of men. A person claiming injury is unprotected in either case. If, in fact, a culpable injury has been done[c] and goes unchastised by the law because of the doctrine of sovereign immunity, that doctrine protects injustice for no better reason than that its source is the state. And the concept becomes this: "the king can do wrong with impunity." This is outlaw doctrine obviously incompatible with the rule of law. Moreover, the notion that government may irresponsibly maim or kill contravenes the most elemental notions of due process of law.

Recognizing the inequities inherent in the concept of sovereign immunity the Supreme Court of California abolished governmental tort immunity in 1961. *Muskopf* v. *Corning Hospital District, id.,* 458. There the court ticked off various arguments in support of the doctrine and disposed of them:

"If the reasons for *Russell* v. *Men of Devon* and the rule of county or local district immunity ever had any substance they have none today. *Public convenience does not outweigh individual compensation and a suit against a*

lying in the fact that "* * * we consider ourselves bound by the fetters of a medieval doctrine, often regarded as having the institutional impregnability of an article of faith, which never had much, if any, justification, and that legislatures have been unwilling to reexamine the whole subject from the point of view of theory and history, in order to bring the law into harmony with the practical exigencies of modern life * * *." *id.* at p. 3, and suggests that "* * * many sacrifices and burdens now rightfully imposed under the police power would more equitably be distributed under the power of eminent domain." *Id.* at pages 3-4

[6]See *Russell* v. *Men of Devon* (1788), 100 Eng. Rep. 359, 362 "* * * it is better that an individual should sustain an injury than that the public should suffer an inconvenience." For a more extensive development of the origins of the immunity concept see fn. 1, *Muskopf* v. *Corning Hospital District* (S. Ct. of Calif. 1961), 359 P. 2d 457, 458-459.

[c]We express no view as to actual culpable injury as it may ultimately develop in this case.

*county hospital or hospital district is against an entity
legally and financially capable of satisfying a judgment."*
(page 459)

"The rule of governmental immunity for tort is an
*anachronism,* without rational basis, and has existed only
*by force of inertia."* (page 460)

*"None of the reasons for its continuance can with-
stand analysis.* No one defends total governmental im-
munity. In fact it does not exist. It has become riddled with
exceptions, both legislative * * * and judicial * * * and *the
exceptions operate so illogically as to cause serious inequal-
ity.* Some who are injured by governmental agencies can
recover, others cannot * * *." (page 460)[7]

"It is contended * * * that article XX, section 6,[8] should
be interpreted as also having substantive significance and
establishing the rule of immunity * * *. If the section has
any substantive significance it would appear to be a *waiver
of immunity."*(pages 460-461)

"The doctrine of governmental immunity *was origin-
ally court made."* (page 461)

"What is before us is a series of sporadic statutes,
each operating on a separate area of governmental im-
munity where its evil was felt most * * *. We read the
statutes as meaning only what they say: that in the areas
indicated there shall be no governmental immunity. *They
leave to the court* whether it should adhere to its own rule
of immunity in other areas." (page 461)

"Abrogation of governmental immunity does not
mean that the state is liable for all harms that result from
its activities. Both the state and individuals are free to
engage in many activities that result in harm to others so

----

[7] It will be noted that this inequality is between the victims of
various kinds of *governmental* torts. Compounding this condition is the
inequality of protection between victims of private torts in contrast
to public torts and the inequality in responsibility between private and
public tort feasors.

[8] Article XX, Section 6 of the California Constitution as set out
in Justice Traynor's opinion is practically identical with the parallel
Ohio section. Section 6 reads: "Suits may be brought against the state
in such manner and in such courts as shall be directed by law."

8

long as such activities are not tortious * * *. Although it 'is not a tort for government to govern' (Jackson, J., dissenting in *Dalehite* v. *United States,* 346 U. S. 15, 57, 73 S. Ct. 956, 979, 97 L. Ed. 1427), and *basic policy decisions* of government within constitutional limitations are therefore necessarily nontortious, it does not follow that the state is immune from liability for torts of its agents. These considerations are relevant to the question whether in any given case the state through its agents has committed a tort * * *, but once it is determined that it has, it must meet its obligation therefor.'' (page 462)[9]

The Supreme Court of Arizona has stated the doctrine of respondeat superior as it applies to government. Governmental employers ''are responsible for the tortious wrongdoing * * * committed by agents and employees acting within the scope of their employment,'' *Stone* v. *Arizona Highway Commission* (Sup. Ct. of Arizona, 1963), 381 P. 2d 107, 113; but governmental officials are immune to suit for discretionary acts within their authority, *Muskopf* v. *Corning Hospital District, supra,* 462. The latter immunity is designed to free officials for the ''unflinching discharge of their duties'' without concern for retaliation, see *Muskopf* v. *Corning Hospital District, id.* 462-463. Given the soundness of the foregoing rules, there is no reason in logic for exempting a state from a response in damages to private persons injured by the discretionary and authorized acts or agents of the state even though agents may be immune. For there are logical reasons, such as encouraging ''unflinching discharge of duty,'' to justify immunizing an agent's exercise of discretion which do not logically extend to the innoculation of the state against the consequences of well-intentioned, authorized, but tortious and damaging acts of state agents. The agents need to perform their authorized duties in an uninhibited manner but the state does not need to avoid the responsibility in tort for the consequences of the agents' damaging acts. It can well afford to respond and in justice should.

---

[9] All emphasis in the quotation is supplied.

Thus, we recognize that the state's employees have a job to do. Moreover, it is clear that the job should not have to be performed on a tight rope with the conscientious employee constantly bedeviled by a fear of personal tortious liability. Therefore, while we continue the immunity for the agent for the obvious reasons, we see no warrant for absolving the principal when in fact a vicarious, tortious act injures a member of the public, well-intentioned or not.[10]

## IV.

The operation of the doctrine of sovereign immunity results in different consequences for injured persons in at least two ways. Persons victimized by private tort feasors may be compensated for their damages. But so long as sovereign immunity is extant persons suffering damage through comparable fault on the part of the state may not recover unless the tortious action happens to be one within a specific exception to the immunity rule. Assuming a case within a specific exception, then two classes of persons injured by the state develop—those hurt in the course of the excepted activity and those not. Such circumstances raise the question whether such differences as those described mount arbitrary and unreasonable distinctions incompatible with the constitutional standard established by the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.

Long ago in *Yick Wo* v. *Hopkins* (1886), 118 U. S. 356, 373-374, in a case involving nationality discrimination, the test of equal protection in the administration of a law was delineated. The court said:

---

[10]We note without explication that whatever problems may be raised by suggesting civil immunity for the agent but not the principal (the state), it is a matter of small practical consequence. If an agent is reckless, criminal, or insubordinate the principal can protect itself by terminating him. As for the agent, it is important that he be neither timorous, careless nor irresponsible in carrying out his duties. For the most part, the agent need not fear a monetary response to liability even were he not immune. His relative poverty is an impenetrable shield.

Therefore, vouchsafing him immunity is of small practical consequence. At the same time it may increase his security in responsible performance.

"Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

Much later in the landmark reapportionment case, *Baker* v. *Carr* (1962), 369 U. S. 186, the Supreme Court of the United States gave a working definition of a court's function under the equal protection clause and at the same time suggested another dimension for the standard:

"* * * it has been open to the courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy but simply arbitrary and capricious action." (page 226)

Is the withholding of a remedy based on reasonable or on arbitrary grounds when it is withheld from persons injured by state torts but not private ones or from some persons but not others injured by government in tortious, but different, phases of its activity? Do such distinctions reflect a rational policy or simply capricious action?

The idea that a sufficient reason for the immunization of government can be found in insulating government to suit is untenable.[11] Government is subject to suit in many obvious ways now. This has not stultified its purposes. There is no reason to suppose that widening tort responsibility will bring it down. It is more than doubtful that making the state respond to the firmly established principle:

"* * * that liability follows tortious wrongdoing; that where negligence is the proximate cause of the injury, the rule is liability and immunity is the exception." *Stone* v. *Arizona Highway Commission, ibid.* 112.

---

[11]The federal courts have a special proscription blocking their jurisdiction of a suit against a state brought by a citizen of another state or "by citizens or subjects of any foreign state." Amendment XI U. S. Constitution. That limitation grew out of an exceptional historical circumstance. See *Chisholm* v. *Georgia* (1793), 2 Dall. 419.

will handicap the state government. Moreover, in controversies between a powerful government and a relatively feeble individual, the harm to be envisioned from starting the contest without a fatal impediment to the individual's case is negligible.

If the threat of multiple suits is not a tenable basis for the distinctions created by the immunity, and we hold it is not, then there is none. The distinctions then depend upon a gossamer as frail as that supporting those distinctions founded on nationality or race. A distinction so based is capricious and represents no policy but an arbitrary attempt to lift state responsibility without reason. In such circumstances the permissible line between reasonable classification or a rational policy, and a denial of equal protection is crossed. This fatally offends the Constitution.

## *V.*

In 1919, Judge Wanamaker concurring in *Fowler* v. *Cleveland*, 100 Ohio St. 158, 176,[12] has made the general point of this opinion in memorable language:

"The whole doctrine of immunity given to a sovereign state was based upon the assumption of the divine right of kings—a king can do no wrong, he is infallible, or, if he do wrong, no subject has any right to complain. This doctrine has been shot to death on so many different battlefields that it would seem utter folly now to resurrect it, even by the judgment of a court of last resort.

"* * * The Constitution of Ohio, Section 16, Bill of Rights, makes no exception in favor of governmental sovereignty. It is as broad and comprehensive as language can make it, and right and remedy run to the individual who has been injured.

"The injury, therefore, is the primary and paramount consideration, no matter by whom said injury is inflicted. When the injury is inflicted the right to sue ripens, the courts are open, and as to those political subdivisions of the

---

[12]The *Fowler* case, holding the city liable to one injured by a negligently driven fire engine returning from a fire, was overruled in *Aldrich* v. *Youngstown* (1922), 106 Ohio St. 342, Wanamaker, J., dissenting.

state that have been for a long time recognized as capable of suing and being sued there can be no reasonable question longer raised as to their liability for their wrongs committed against the individual's rights as declared and defined by constitutional guaranties.

"* * * Now if the constitution so permitted, the inherent powers of government would no doubt permit the taking of such property without compensation, but realizing the equities of the case in the property owner the constitution safeguards that right by providing that compensation shall be made to the owner of the property, when taken for public use, and the compensation is raised by taxation over the entire community, all contributing. In principle why should there be any difference when human life is taken in the exercise of some governmental function? *As to the taking of the property there is no negligence, there is no wrong, but compensation nevertheless is made. As to the taking of life there is negligence, there is wrong, and why should satisfaction not be made for such wrong?*" (Emphasis supplied.)

On however "many battlefields" sovereign immunity has been "shot to death," it is our view that now it ought to be laid to rest. Then, indeed, may "the humblest citizen feel * * * he is the equal of the sovereign before the law."

The judgment is reversed and the cause remanded for further proceedings according to law.

*Judgment reversed and cause remanded.*

KRENZLER, J., concurs.

MANOS, J., dissenting. The law in Ohio as to the doctrine of sovereign immunity is clear. Section 16, Article I of the Ohio Constitution, as amended in 1912, reads:

"Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

Beginning with *Raudabaugh* v. *State* (1917), 96 Ohio St. 513, the Ohio Supreme Court has held that Section 16, Article I, is not self-executing and that statutory authority

must be enacted before suits may be brought against the state. This proposition of law has been followed by Ohio since 1917. See *Schaffer* v. *Board* (1960), 171 Ohio St. 228; *Wolf* v. *Ohio State University Hosp.* (1959), 170 Ohio St. 49; *State, ex rel. Williams,* v. *Glander* (1947), 148 Ohio St. 188; *Palumbo* v. *Indus. Comm.* (1942), 140 Ohio St. 54.

The majority departs from this long succession of cases in reaching its decision. They conclude that sovereign immunity in Ohio is judge-made and not a product of the clear and unambiguous meaning of the amendment itself. It is unquestioned that the amendment abrogated the common law rule granting the state immunity from suit, but it changed the rule simply to the extent of eliminating immunity when and if the state consents to be sued.

If it is believed that the doctrine of sovereign immunity is indeed an antique of no modern relevancy, the forum for this change rests either on legislative action or with a new constitutional convention. As stated by the Ohio Supreme Court in *Palumbo* v. *Indus. Comm.* (1942), 140 Ohio St. 54, at 60:

"And so if this court should validate the decision of the court below, we, as judges, would be determining the 'courts' and the 'manner' in which the state was to be sued. That determination is clearly a legislative, not a judicial, function. The essence of 'a government of laws and not of men' lies in its separation of powers."

The majority cites the California case of *Muskopf* v. *Corning Hospital District* (1961), 55 Cal. 2d 211, 359 P. 2d 457, as support for their holding which I am not bound to follow, especially in light of the overwhelming Ohio authority to the contrary. The facts in *Muskopf* are vastly different from the facts in this case. Mrs. Muskopf, as a paying patient of a hospital operated by the government, was negligently injured when moved by an employee of the hospital. However, in this cause, the Governor of the state of Ohio is charged with negligently ordering the National Guard to Kent State University at a time of great confusion and widespread destruction resulting in the tragic death of four students. Although Ohio, in the analogous

14

case of *Wolf* v. *Ohio State University Hosp.* (1959), 170 Ohio St. 49, has ruled the opposite of *Muskopf,* one can readily see that the facts here represent not the negligence of an employee of a state hospital, but the nondelegable, discretionary act of the governor who in times of unmistakable peril must take those measures necessary to preserve the safety and peace of the people within the territorial boundaries of Ohio. As stated by Mr. Justice Harlan in *Barr* v. *Matteo* (1959), 360 U. S. 564, at 571:

"The reasons for the recognition of the privilege have been often stated. It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect to acts done in the courts of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government."

The events subsequent to *Muskopf* illustrate the conflict which could arise in Ohio as it did between the legislative and judicial branches of California. Following *Muskopf,* California enacted legislation postponing its enforcement until laws could be considered to the contrary. Recognizing the desirability of immunity, a Torts Claim Act was passed in 1963 enumerating the circumstances under which the state would be liable for its torts.

In *Susman* v. *Los Angeles* (1969), 269 Cal. App. 2d 803, an analogous situation resulted by reason of the riots in the Watts district of Los Angeles. In affirming the demurrer to the amended complaint, the court stated:

"Courts and commentators have therefore centered their attention on an assurance of judicial abstention in areas in which the responsibility for *basic policy decisions* has been committed to coordinate branches of government. Any wider judicial review, we believe, would place the court in the unseemly position of determining the propriety of decisions expressly entrusted to a coordinate branch of government. Moreover, the potentiality of such review might even in the first instance affect the coordinate body's decision-making process." 269 Cal App. 2d at 818.

"When and under what circumstances the National Guard should be called into action to preserve the peace and to protect property is a matter within the discretion of the Governor * * * [and] is not open to judicial inquiry or review." 269 Cal. App. 2d 818-19.

Under existing California law the state's immunity is still viable. The need of the present law of California is a direct result of the invasion by the judiciary into the function of the legislature. I believe we should constrain ourselves from taking such action in Ohio. For a more in depth explanation of California law from the period of 1961 to the present, see *Johnson* v. *State* (1968), 69 Cal. 2d 782, 447 P. 2d 352; *Cabell* v. *State* (1967), 67 Cal. 2d 150, 430 P. 2d 34; *Flournoy* v. *State* (1962), 57 Cal. 2d 497, 370 P. 2d 331; *Corning Hosp. Dist.* v. *Superior Court* (1962), 57 Cal. 2d 488, 370 P. 2d 325; *Susman* v. *Los Angeles* (1969), 269 Cal. App. 2d 803; *Hayes* v. *State* (1964), 231 Cal. App. 2d 48.

The constitutionality of Section 16, Article I of the Ohio Constitution has been ruled upon by the Supreme Court of the United States in *Palmer* v. *Ohio* (1918), 248 U. S. 32. The court held:

"The right of individuals to sue a state, in either a federal or a state court, cannot be derived from the Constitution or laws of the United States. It can only come from the consent of the state * * * . Whether Ohio gave the required consent must be determined by the construction to be given to the constitutional amendment quoted, and this is a question of local state law, as to which the decision of the state supreme court is controlling with this court, *no federal right being involved * * *.*" 248 U. S. at 34. (Citations omitted.) (Emphasis added.)

The passage of time has not diminished the impact of that case. See *Parden* v. *Terminal Ry. of Alabama Docks Dept.* (1964), 377 U. S. 184. Finding no federal constitutional issue involved, and no Ohio authority to the contrary, I dissent.