471 F.2d 430
 Arthur KRAUSE, Administrator of the Estate of Allison
Krause, Deceased, Plaintiff-Appellant,
v.
James RHODES, Governor of the State of Ohio, et al.,
Defendants-Appellees.
Elaine B. MILLER, Administratrix of the Estate of Jeffrey
Glenn Miller, Deceased, Plaintiff-Appellant,
v.
James RHODES, Individually and as Governor of the State of
Ohio, et al., Defendants-Appellees.
Sarah SCHEUER, Administratrix of the Estate of Sandra Lee
Scheuer, Deceased, Plaintiff-Appellant,
v.
James RHODES, Governor of the State of Ohio, et al.,
Defendants-Appellees.
 Nos. 71-1622 to 71-1624.
 United States Court of Appeals,
Sixth Circuit.
 Nov. 17, 1972.
 
 Steven A. Sindell, Sindell, Sindell, Bourne, Markus, Stern & Spero, Cleveland, Ohio, Joseph Kelner, New York City, Michael E. Geltner, American Civil Liberties Union of Ohio, Columbus, Ohio, for appellants; Melvin L. Wulf, Sanford Jay Rosen, New York City, Nicholas Waranoff, American Civil Liberties Union Foundation, Stanley K. Laughlin, Jr., Michael E. Geltner, American Civil Liberties Union of Ohio, Columbus, Ohio, Niki Z. Schwartz, Eugene S. Bayer, American Civil Liberties Union, Cleveland, Ohio, Michael S. Harshman, American Civil Liberties Union, Youngstown, Ohio, Nelson G. Karl, American Civil Liberties Union of Ohio, Walter S. Haffner, American Civil Liberties Union of Ohio, Cleveland, Ohio, on brief.
 Charles E. Brown and Robert F. Howarth, Jr., Crabbe, Newlon, Potts, Schmidt, Brown & Jones, Columbus, Ohio, for appellees; R. Brooke Alloway, Columbus, Ohio, C. D. Lambros, Cleveland, Ohio, on brief.
 Before WEICK and CELEBREZZE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.
 WEICK, Circuit Judge.
 
 
 1
 The Governor of Ohio called out the Ohio National Guard to suppress a riot in the City of Kent, Ohio, and on the campus of Kent State University. Two proclamations of the Governor with respect thereto are appended to this opinion. They were attached to motions to dismiss filed by certain defendants in the District Court. During the riot each of the plaintiffs' decedents, who were students at Kent State University, allegedly were shot and killed by one of the unnamed and unknown members of the National Guard. Their personal representatives filed separate actions in the District Court to recover a total of $11,000,000-damages against the Governor of Ohio, the Adjutant General, and the Assistant Adjutant General. Two of the suits named four officers and various unknown and unnamed officers and enlisted men of the National Guard. The two suits even named the President of Kent State University as a defendant, in one of which suits it was alleged that he recklessly, wilfully and wantonly omitted to take any action to control the troops on the campus, or to decrease the risk of injury to the students, and in the other suit he was charged with a conspiracy. The suits were brought under the Civil Rights Act, 42 U.S.C. Sec. 1983, 28 U.S.C.A. Secs. 1331, 1334, and also under the wrongful death statutes of Ohio, on the theory of pendent jurisdiction.
 
 
 2
 The complaints alleged generally and in conclusory terms that the defendants conspired to call out the National Guard and were guilty of wanton, wilful and negligent conduct when they knew or should have known that there was no cause or insufficient cause therefor; that the troops were not properly trained in the correct and reasonable use of weapons to suppress civil disorders; and that the troops were permitted to be armed with loaded weapons. It is alleged that as a result the decedents, who allegedly were not participating in any way in a riot and were not negligent in any manner, were shot and killed.
 
 
 3
 The motions to dismiss were filed by the defendants Rhodes, Del Corso, Canterbury, Jones, Martin and Srp. These defendants were the only defendants who were served with process in the cases in the District Court, or who filed motions in the cases.
 
 
 4
 The theory of the motions to dismiss was that these suits, although nominally against the Chief Executive and officers of the State, in substance and effect were against the State of Ohio since they directly and vitally affected the rights and interests of the State in the performance of its highest function, namely, the suppression of riots or insurrection and the protection of the public.
 
 
 5
 It was on this theory and that of executive immunity that the District Court dismissed the actions and the plaintiffs have appealed.[1] We affirm.
 
 
 6
 Amendment XI of the Constitution of the United States provides:
 
 
 7
 "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."In Ex Parte New York, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921), the Supreme Court held:
 
 
 8
 "That a state may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a state without consent given; not one brought by citizens of another state, or by citizens or subjects of a foreign state, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the amendment is but an exemplification."
 
 
 9
 The Court made it clear that the applicability of the Eleventh Amendment "is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record." Id. at 500, 41 S.Ct. at 590.
 
 
 10
 The general rule was stated in Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), as follows:
 
 
 11
 "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' Land v. Dollar, 330 U.S. 731, 738, [67 S.Ct. 1009, 1012, 91 L.Ed. 1209] (1947), or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' Larson v. Domestic & Foreign Corp., supra, [337 U.S.] at 704, [69 S.Ct. 1457, at 1468, 93 L.Ed. 1628]; Ex parte New York, 256 U.S. 490, 502 [41 S.Ct. 588, 591, 65 L.Ed. 1057] (1921)."
 
 
 12
 Moyer v. Peabody, 212 U.S. 78, 29 S. Ct. 235, 53 L.Ed. 410 (1909), like the present case, was an action brought under the Civil Rights Act to recover damages against the former Governor of Colorado, the former Adjutant General of the National Guard of the same state, and a Captain of a company of the National Guard, for an imprisonment of plaintiff by them while in office. In upholding the dismissal of the complaint on demurrer, Justice Holmes stated:
 
 
 13
 "In such a situation we must assume that he had a right, under the state Constitution and laws, to call out troops, as was held by the supreme court of the state. The Constitution is supplemented by an act providing that 'when an invasion of or insurrection in the state is made or threatened, the governor shall order the national guard to repel or suppress the same.' Laws of 1897, chap. 63, art. 7, Sec. 2, p. 204. That means that he shall make the ordinary use of the soldiers to that end; that he may kill persons who resist, and, of course, that he may use the milder measure of seizing the bodies of those whom he considers to stand in the way of restoring peace. Such arrests are not necessarily for punishment, but are by way of precaution to prevent the exercise of hostile power. So long as such arrests are made in good faith and in the honest belief that they are needed in order to head the insurrection off, the governor is the final judge and cannot be subjected to an action after he is out of office, on the ground that he had not reasonable ground for his belief. If we suppose a governor with a very long term of office, it may be that a case could be imagined in which the length of the imprisonment would raise a different question. But there is nothing in the duration of the plaintiff's detention or in the allegations of the complaint that would warrant submitting the judgment of the governor to revision by a jury. It is not alleged that his judgment was not honest, if that be material, or that the plaintiff was detained after fears of the insurrection were at an end." (pp. 84-85, 29 S.Ct. pp. 236-237)He further said:
 
 
 14
 "When it comes to a decision by the head of the state upon a matter involving its life, the ordinary rights of individuals must yield to what he deems the necessities of the moment. Public danger warrants the substitution of executive process for judicial process. See Keely v. Sanders, 99 U.S. 441, 446, [25 L.Ed. 327, 328]. This was admitted with regard to killing men in the actual clash of arms; and we think it obvious, although it was disputed, that the same is true of temporary detention to prevent apprehended harm. As no one would deny that there was immunity for ordering a company to fire upon a mob in insurrection, and that a state law authorizing the governor to deprive citizens of life under such circumstances was consistent with the 14th Amendment, we are of opinion that the same is true of a law authorizing by implication what was done in this case. As we have said already, it is unnecessary to consider whether there are other reasons why the circuit court was right in its conclusion. It is enough that, in our opinion, the declaration does not disclose a 'suit authorized by law to be brought to redress the deprivation of any right secured by the Constitution of the United States.' See Dow v. Johnson, 100 U.S. 158, [25 L.Ed. 632]." (Id. at 85-86, 29 S.Ct. at 251).
 
 
 15
 In Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932), Chief Justice Hughes, in referring to Moyer v. Peabody, supra, stated:
 
 
 16
 "By virtue of his duty to 'cause the laws to be faithfully executed,' the executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen. His decision to that effect is conclusive. That construction, this Court has said, in speaking of the power constitutionally conferred by the Congress upon the President to call the militia into actual service, 'necessarily results from the nature of the power itself, and from the manifest object contemplated.' The power 'is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union.' Martin v. Mott, 12 Wheat. 19, 29, 30, [6 L.Ed. 537]. Similar effect, for corresponding reasons, is ascribed to the exercise by the Governor of a state of his discretion in calling out its military forces to suppress insurrection and disorder. Luther v. Borden, 7 How. 1, 45, [12 L.Ed. 581]; Moyer v. Peabody, 212 U.S. 78, 83, [29 S.Ct. 235, 236, 53 L. Ed. 410]. The nature of the power also necessarily implies that there is a permitted range of honest judgment as to the measures to be taken in meeting force with force, in suppressing violence and restoring order, for, without such liberty to make immediate decisions, the power itself would be useless. Such measures, conceived in good faith, in the face of the emergency, and directly related to the quelling of the disorder or the prevention of its continuance, fall within the discretion of the executive in the exercise of his authority to maintain peace. Thus, in Moyer v. Peabody, supra, the Court sustained the authority of the Governor to hold in custody temporarily one whom he believed to be engaged in fomenting disorder, and right of recovery against the Governor for the imprisonment was denied. The Court said that, as the Governor 'may kill persons who resist,' he 'may use the milder measures of seizing the bodies of those whom he considers to stand in the way of restoring peace. Such arrests are not necessarily for punishment, but are by way of precaution to prevent the exercise of hostile power. So long as such arrests are made in good faith and in the honest belief that they are needed in order to head the insurrection off, the governor is the final judge and cannot be subjected to an action after he is out of office on the ground that he had not reasonable ground for his belief.' In that case it appeared that the action of the Governor had direct relation to the subduing of the insurrection by the temporary detention of one believed to be a participant, and the general language of the opinion must be taken in connection with the point actually decided. Cohens v. Virginia, 6 Wheat. 264, 399, [5 L.Ed. 257]; Carroll v. Carroll's Lessee, 16 How. 275, 287 [14 L.Ed. 936]; Myers v. United States, 272 U.S. 52, 142, [47 S.Ct. 21, 71 L.Ed. 160]." (Id. at 399-400, 53 S.Ct. at 196; emphasis added).
 
 
 17
 In Gregoire v. Biddle, 177 F.2d 579 (2nd Cir. 1949), which was an action under the Civil Rights Act for damages against federal officers for false arrest, Chief Judge Learned Hand who wrote the opinion for the Court said:
 
 
 18
 "It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. Judged as res nova, we should not hesitate to follow the path laid down in the books.
 
 
 19
 "The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. For the foregoing reasons it was proper to dismiss the first count."
 
 
 20
 In Barr v. Matteo, 360 U.S. 564, 79 S. Ct. 1335, 3 L.Ed.2d 1434 (1959), Mr. Justice Harlan, who wrote the opinion for the Court, stated,
 
 
 21
 "The reasons for the recognition of the privilege have been often stated. It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties-suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government."Justice Harlan then quoted the language of Learned Hand from Gregoire v. Biddle, hereinbefore set forth, and stated:
 
 
 22
 "We do not think that the principle announced in [Spalding v.] Vilas [161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780] can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts. The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy." (Footnotes omitted)
 
 
 23
 In Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), the Court said in discussing legislative immunity:
 
 
 24
 "The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. The holding of this Court in Fletcher v. Peck, 6 Cranch 87, 130, [3 L.Ed. 162], that it was not consonant with out scheme of government for a court to inquire into the motives of legislators, has remained unquestioned. See cases cited in Arizona v. California, 283 U.S. 423, 455, [51 S. Ct. 522, 526, 75 L.Ed. 1154]."
 
 
 25
 Bradley v. Fisher, 80 U.S. 335, 20 L. Ed. 646 (1871), and Alzua v. Johnson, 231 U.S. 106, 34 S.Ct. 27, 58 L.Ed. 142 (1913), upheld judicial immunity even though acts were in excess of jurisdiction and were alleged to have been done corruptly and maliciously.
 
 
 26
 Although occasionally both legislators and judges have been charged with depriving individuals of their constitutional rights, they have unquestioned immunity from suit. Gregoire v. Biddle, supra, and Barr v. Matteo, supra, applied the immunity to the Executive Department for the same reasons that it was extended to legislators and judges. The Executive Department is charged with the duty of protecting not only the other two departments of government but also the general public from domestic as well as foreign enemies. Such protection is the highest duty the Executive Department is obligated to perform.[2] It would not be conducive to good government to require the Chief Executive of either the nation or the state to defend himself in court, in a multitude of protracted actions, because he called out troops to suppress riots or disorders which resulted in injury. It would surely take a hardy executive to exercise his discretion by calling out troops to suppress a riot or insurrection, if he knew that in so doing the wisdom of his action could later be challenged in the courts. And since the courts have granted to themselves absolute immunity, it would seem incongruous for them not to extend the same privilege to the Executive.
 
 
 27
 To place a straightjacket on the state's Chief Executive in times of emergency so that he could not freely exercise his discretion, would indeed stop the state government "in its tracks." Dugan v. Rank, supra, 372 U. S. at 621, 83 S.Ct. 999; Larson v. Domestic & Foreign Corp., 337 U.S. 682 at 704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); Ogletree v. McNamara, 449 F. 2d 93 (6th Cir. 1971).
 
 
 28
 The suit against the state executives in this case, while not asking for a money judgment against the state, would seriously "interfere with public administration", would "restrain the Government from acting", and would "compel it to act". Dugan v. Rank, supra.
 
 
 29
 Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L.Ed. 714 (1908), relied upon by the appellants is inapposite. It was an action for injunction to prohibit a state attorney general from enforcing an unconstitutional state statute which fixed confiscatory rates and interfered with interstate commerce. Our case, on the other hand, is an action for damages and also involves the question whether the federal courts should interfere with the performance by the state's chief executive of his highest duty to suppress riots or insurrections and protect the public.
 
 
 30
 Article III, Section 10 of the Ohio Constitution provides that the Governor shall be Commander in Chief of the military and naval forces of the state except when they are called into service of the United States. Article IX Section 3 provides that the Governor has power to appoint the adjutant general, quartermaster general and other staff officers. Article IX Section 4 provides that he has the "power to call forth the militia to execute the laws of the state, to suppress insurrection, and repel invasion."
 
 
 31
 Pertinent provisions of Ohio statutes relating to the militia are as follows:
 
 
 32
 Ohio Revised Code, Section 5923.21, "The organized militia may be ordered by the governor to aid the civil authorities to suppress or prevent riot or insurrection, or to repel or prevent invasion, and shall be called into service in all cases before the unorganized militia."
 
 
 33
 Ohio Revised Code, Section 5923.22, "When there is a tumult, riot, mob, or body of men acting together with intent to commit a felony, or to do or offer violence to person or property, or by force and violence break or resist the laws of the state, the commander in chief may issue a call to the commanding officer of any organization or unit of the organized militia, to order his command or part thereof, describing it, to be and appear, at a time and place therein specified, to act in aid of the civil authorities.
 
 
 34
 "No officer or enlisted man in the organized militia, shall refuse to appear at the time and place designated when lawfully directed to do so in conformity to the laws of the suppression of tumults, riots, and mobs, or shall fail to obey an order issued in such case."
 
 
 35
 Ohio Revised Code, Section 5923.37 (Supp.),
 
 
 36
 "When a member of the organized militia is ordered to duty by state authority during a time of public danger, he is not answerable in a civil suit for any act performed within the scope of his military duties at the scene of any disorder within said designated area unless the act is one of willful or wanton misconduct."
 
 
 37
 Ohio Revised Code, Section 2923.55 (Supp.),
 
 
 38
 "Police officers, special police officers, sheriffs, deputy sheriffs, highway patrolmen, other law enforcement officers, members of the organized militia, members of the armed forces of the United States, and firemen, when engaged in suppressing a riot or in dispersing or apprehending rioters and after an order to desist and disperse has been issued pursuant to section 2923.51 of the Revised Code, are guiltless for killing, maiming, or injuring a rioter as a consequence of the use of such force as is necessary and proper to suppress the riot or disperse or apprehend rioters. This section does not relieve a member of the organized militia or armed forces of the United States from prosecution by court-martial for a military offense."
 
 
 39
 Kent State University is a state institution. Ohio Rev.Code Sec. 3341.01. Its Board of Trustees is appointed by the governor with the advice and consent of the senate. Ohio Rev.Code Sec. 3341.02 (B).
 
 
 40
 Ohio has long applied the doctrine of sovereign immunity not only to suits against the state but also to its agencies and instrumentalities. Board of Commissioners v. Mighels, 7 Ohio St. 109 (1857); Palmer v. State, 96 Ohio St. 513, 118 N.E. 102 (1917); Palumbo v. Industrial Commission, 140 Ohio St. 54, 42 N.E.2d 766 (1942); State ex rel. Williams v. Glander, 148 Ohio St. 188, 74 N.E.2d 82 (1947); Wolf v. Ohio State University Hospital, 170 Ohio St. 49, 162 N.E.2d 475 (1959).
 
 
 41
 In Glander, the Court approved and quoted the following language from American Jurisprudence:
 
 
 42
 "While a suit against state officials is not necessarily a suit against the state, within the rule of immunity of the state from suit without its consent, that rule cannot be evaded by bringing an action nominally against a state officer or a state board, commission, or department in his or its official capacity when the real claim is against the state itself, and the state is the party vitally interested. If the rights of the state would be directly and adversely affected by the judgment or decree sought, the state is a necessary party defendant, and if it cannot be made a party, that is, if it has not consented to be sued, the suit is not maintainable. The state's immunity from suit without its consent is absolute and unqualified, and a constitutional provision securing it is not to be so construed as to place the state within the reach of the process of the court."
 
 
 43
 Glander was approved and followed in Krause v. State, 31 Ohio St.2d 132, 134, 142, 285 N.E.2d 736 (1972) certiorari pending.
 
 
 44
 In Palmer v. State, 248 U.S. 32, 39 S. Ct. 16, 63 L.Ed. 108 (1918), which grew out of Palmer v. State, 96 Ohio St. 513, 118 N.E. 102 (1917), the Supreme Court held:
 
 
 45
 "The right of individuals to sue a state, in either a federal or state court, cannot be derived from the Constitution or laws of the United States. It can come only from the consent of the state."
 
 
 46
 The State of Ohio has not consented to be sued in either the state or federal courts.[3]
 
 
 47
 Lower court cases holding that State universities are not amenable to suits in tort actions are:
 
 
 48
 Thacker v. Board of Trustees, 29 Ohio Misc. 31, 277 N.E.2d 818, following Wolf v. Ohio State University Hospital, 170 Ohio St. 49, 162 N.E.2d 475 (1959); Carolyne v. Youngstown State University, unreported, 7th Dist. Court of Appeals dismissed by Supreme Court of the United States, 404 U.S. 1007, 92 S.Ct. 683, 30 L.Ed.2d 656.
 
 
 49
 In Estate of Burks v. Ross, 438 F.2d 230 (6th Cir. 1971), we held that an Administrator of a Veterans Hospital and the institution's psychiatrist had executive immunity.[4]
 
 
 50
 In our judgment, President White had executive immunity. No possible claim for relief, other than in conclusory language, was stated against him.
 
 
 51
 Relative to the allegations in the complaint that the members of the National Guard were permitted to carry loaded weapons and that they were not properly trained for suppressing civilian riots and disturbances, it is clear that the judiciary ought not to involve itself in determining military or political questions. Our expertise does not extend to that field. We ought not to limit the Governor in the exercise of his discretion to call out the National Guard to suppress a riot or insurrection; neither should we tell the military not to carry loaded weapons to protect the troops when someone may shoot or throw rocks at them.
 
 
 52
 Bright v. Nunn, Governor, 448 F.2d 245 (6th Cir. 1971), involved a riot on the campus of the University of Kentucky at Lexington following the Kent State riots, during the course of which the ROTC building and several other buildings were destroyed by fire. An adjoining dormitory for women had to be evacuated in the middle of the night. Rocks were thrown at teachers, security officers, and a policeman. A meeting of the Board of Trustees was disrupted. Outside agitators were on the campus, some of whom were convicted felons, and one was an arsonist. The trouble in that case was that the Guard was not called out soon enough to prevent the destruction of property. When the Guard was finally called out the disturbances were promptly quelled. The President of the student body, joined by the local chapter of the American Association of College Professors, brought a class action in behalf of the students and professors against the governor and the President of the University alleging that their rights of speech and assembly had been denied them by the presence of the troops on the campus, and they asked for declaratory relief determining the impropriety of such actions and an injunction against further invasion of their asserted rights. The District Court dismissed the complaint following an evidentiary hearing. We affirmed.
 
 
 53
 The federal government is inextricably involved with the states in the training and weaponry of the National Guard. The involvement is stated very well in the dissenting opinion of Judge Celebrezze in Morgan v. Rhodes, 456 F. 2d 608 (6th Cir. 1972), wherein he said:
 
 
 54
 "I find a 'textually demonstrable constitutional commitment' of National Guard training and weaponry to a coordinate political department under Article I, Section 8, Clause 16, of the United States Constitution, which provides that Congress shall have the power
 
 
 55
 'To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.'
 
 
 56
 "Pursuant to this constitutional authority, Congress has enacted legislation which governs the training and weaponry of the National Guard. 32 U.S.C. Secs. 501-507, 701. Moreover, Congress has expressly provided that
 
 
 57
 'The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard.' 32 U. S.C. Sec. 110.
 
 
 58
 And under 32 U.S.C. Sec. 108, the President has available the following means by which to enforce any regulations which he or the Congress may prescribe for the National Guard:
 
 
 59
 'If, within a time to be fixed by the President, a State does not comply with or enforce a requirement of, or regulation prescribed under, this title its National Guard is barred, wholly or partly as the President may prescribe, from receiving money or any other aid, benefit, or privilege authorized by law.'[1]
 
 
 60
 "This power to prescribe and enforce regulations for the training and weaponry of the National Guard, which Congress has delegated in part to the President, is more than a mere token and unexercised authority. In July of 1967, when civil disorders had come to the forefront of national concern, President Johnson announced that he had ordered the addition of special training courses to the existing National Guard training program. Weekly Compilation of Presidential Documents, Vol. 3, No. 30, at 1056 (1967). Moreover, under the authority delegated to the President, the Department of the Army has specifically set mandatory riot-control training requirements for all Army National Guard and certain Air National Guard units. See Report of the National Advisory Commission on Civil Disorders, supra, at 505.[5]
 
 
 61
 "I believe that the congressional and executive authority to prescribe and regulate the training and weaponry of the National Guard, as set forth above, clearly precludes any form of judicial regulation of the same matters. I can envision no form of judicial relief which, if directed at the training and weaponry of the National Guard, would not involve a serious conflict with a
 
 
 62
 'coordinate political department; . . . a lack of judicially discoverable and manageable standards for resolving [the question]; . . . the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; . . . the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; . . . an unusual need for unquestioning adherence to a political decision already made; [and] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.' Baker v. Carr, supra, 369 U. S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d 663.
 
 
 63
 Any such relief, whether it prescribed standards of training and weaponry or simply ordered compliance with the standards set by Congress and/or the Executive, would necessarily draw the courts into a nonjusticiable political question, over which we have no jurisdiction."
 
 
 64
 It would appear that the United States was a necessary party to the determination of the issues as it was involved in the training of the National Guard and their use of weaponry. Failure to join an indispensable party requires dismissal of the action, Rules 12(b) and 19, Fed.R.Civ.P. Any decision rendered by the District Court relative to the training and weaponry of the Guard would require action to be taken by both state and federal governments. To require such action to be taken is beyond the jurisdiction of the Court. The United States has not consented to be sued.
 
 
 65
 It is obvious from a reading of the complaints that the plaintiffs do not know who fired the shots that resulted in the deaths of their decedents. In two of the complaints they have sued "Various Officers and Enlisted Men, true names presently unknown, being members of G Company, 107th Armored Cavalry Regiment and A Company, First Battalion, 145th Infantry Regiment, of the Ohio National Guard." The two plaintiffs may not bring into court an entire regiment of troops merely by suing "various officers and enlisted men, true names presently unknown." The unnamed Officers and Enlisted Men were not served with process and were not properly before the District Court. It had no jurisdiction over them.
 
 
 66
 Furthermore, no relationship of respondeat superior existed between the unnamed enlisted men and the named and unnamed officers and the Governor of Ohio. The enlisted men, as well as the officers of the Guard, were all agents and servants of the State of Ohio.
 
 
 67
 The allegation of conspiracy, without stating any supporting facts, is a pure conclusion of law.
 
 
 68
 We hold that the actions against the Governor, the officers of the National Guard, and the President of Kent State University, are in substance and effect actions against the State of Ohio. Suits against the State are prohibited by the Eleventh Amendment. The Governor, the officers of the Guard, and the President of Kent State University all have executive immunity. The unnamed and unknown officers and enlisted members of the Guard, none of whom was served with process, were not before the District Court, and it had no jurisdiction over them.
 
 THE DISSENT
 
 69
 With all due respect to our brother, we have difficulty in following his lengthy and labored dissenting opinion. We are unable to reconcile it with his partial dissent in the case of Morgan v. Rhodes, 456 F.2d 608 (6th Cir. 1972), wherein he stated rather clearly that the federal government was inextricably involved in the training and weaponry of the National Guard. (Id. at 618, et seq.). If this is true, the suit should also be against the Federal Government. The United States is an indispensable party; there is a defect of parties. But, as we have pointed out, the Federal Government is not amenable to suit, and neither is the state.
 
 
 70
 According to the dissent, the constitutional rights of a citizen may even be violated flagrantly by legislators and judges, with impunity, because they have immunity. He relies on Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). See also Bradley v. Fisher, 80 U.S. 335, 20 L.Ed. 646 (1871); Alzua v. Johnson, 231 U.S. 106, 34 S.Ct. 27, 58 L.Ed. 142 (1913).
 
 
 71
 Where immunity exists, it cannot be defeated by allegations that the defendant acted maliciously. Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949); Tenney v. Brandhove, supra.
 
 
 72
 We think the dissent incorrectly applies Ohio law. In State ex rel. Williams v. Glander, 148 Ohio St. 188, 74 N.E.2d 82 (1947), the Supreme Court of Ohio made it clear that the common law rule of immunity cannot be evaded by bringing a suit nominally against a state officer when the real claim is against the state itself. Glander was approved by the Supreme Court in Krause v. State, 31 Ohio St.2d 132, 285 N.E.2d 736 (1972), wherein the Court held that the state had not waived immunity with respect to the claim of one of the appellants in these appeals.
 
 
 73
 Nor do we agree with the dissent's interpretation of Ohio Revised Code Sec. 5923.37 (Supp.) which states:
 
 
 74
 "When a member of the organized militia is ordered to duty by state authority during a time of public danger, he is not answerable in a civil suit for any act performed within the scope of his military duties at the scene of any disorder within said designated area unless the act is one of willful or wanton misconduct."
 
 
 75
 This statute is in derogation of the common law of the state and must be strictly construed. Lee Turzillo Contracting Co. v. Cincinnati Metropolitan Housing Authority, 10 Ohio St.2d 5, 225 N.E.2d 255 (1967). It must be read in pari materia with Sections 5923.21, 5923.22 and 2923.55 hereinbefore quoted, and must be considered in the light of State ex rel. Williams v. Glander, supra.
 
 
 76
 It applies only when a member of the Guard is ordered to duty by state authority. In the present case the members of the Guard were ordered to duty by state authority, namely, the Governor of Ohio. The liability part of the statute thus applies only to the members of the Guard and not to the Governor, who was already protected by executive immunity without limitation thereon. Furthermore, there is no averment in the pleadings that the Governor was at the "scene" at the time of the shooting.
 
 
 77
 The officers of the Guard can be held liable only for their own conduct. They are not liable for negligence or willful and wanton conduct on the part of members of the Guard, as these members are agents of the state of Ohio and are not servants of the officers. The complaints do not state claims upon which relief can be granted.
 
 
 78
 It is also clear that the District Court had no jurisdiction of the diversity claim of Sarah Scheuer, as she is a resident of Ohio.
 
 
 79
 Not one Ohio case is cited in the dissent wherein the Governor, the officers or members of the Guard, have been held liable in a civil action for acts performed in the suppression of insurrection. They obviously are not responsible for any dereliction of the Federal Government in the training and weaponry of the Guard, in which it is inextricably involved; nor are they liable under Ohio law for negligence.
 
 
 80
 We ought not to deter the Chief Executives of either the state or the nation in the unflinching performance of their duty to protect the public, nor should we make their actions in this respect in times of emergency, subject to judicial review.
 
 
 81
 The Civil Rights Act, Sec. 1983, cannot be engrafted on the Eleventh Amendment by judicial construction.
 
 
 82
 Affirmed.
 
 APPENDIX
 EXHIBIT I
 State of Ohio
 EXECUTIVE DEPARTMENT
 Office of the Governor
 Columbus
 PROCLAMATION
 
 83
 WHEREAS, in northeastern Ohio, particularly in the counties of Cuyahoga, Mahoning, Summit and Lorain, and in other parts of Ohio, in particular Richland, Butler and Hamilton Counties, there exist unlawful assemblies and roving bodies of men acting with intent to commit felony and to do violence to person or property in disregard of the laws of the State of Ohio and the United States of America; and
 
 
 84
 WHEREAS, said unlawful assemblies and bodies of men have by acts of intimidation and threats of violence put lawabiding citizens in fear of pursuing their normal vocations in the transportation industry; and
 
 
 85
 WHEREAS, local government officials, including sheriffs and their deputies and municipal police departments, are unable with their own forces to bring about a cessation of violence and reduce the believability of threats of violence; and
 
 
 86
 WHEREAS, troops of the Ohio National Guard, in coordination with the Ohio State Highway Patrol and local peace officers, can bring about a restoration of confidence in the ability of citizens to move freely in the conduct of their business over the streets and highways of the State; and
 
 
 87
 WHEREAS, the Mayors of many Ohio cities, after taking counsel with each other, have urgently requested that the Governor make available the troops of the Ohio National Guard to assist in maintaining order and in restoring freedom of transportation movement,
 
 
 88
 NOW, THEREFORE, I, JAMES A. RHODES, Governor and commander-in-chief of the militia of the State of Ohio, do hereby order into active service such personnel and units of the militia as may be designated by the Adjutant General to maintain peace and order and to protect life and property throughout the State of Ohio; and said Adjutant General, and through him the commanding officer of any organization of such militia, is authorized and ordered to take action necessary for the restoration of order throughout the State of Ohio. The military forces involved will act in aid of the civil authorities and shall consult with them to the extent necessary to determine the objects to be accomplished, leaving the procedure of execution to the discretion of the commanding military officer designated by the Adjutant General.
 
 
 89
 The Adjutant General shall provide all transportation, services, and supplies necessary for the militia; and all statutory provisions requiring advertisement for bids in relation to their procurement are hereby suspended.
 
 
 90
 I command all persons engaged in riotous and unlawful proceedings to cease and desist from such activities.
 
 
 91
 The active military duty herein ordered is hereby designated as service in a time of public danger.
 
 
 92
 This proclamation shall continue in force until revoked.
 
 
 93
 (SEAL OF OHIO)
 
 
 94
 IN WITNESS WHEREOF, I have hereunto subscribed my name and caused the Great Seal of the State of Ohio to be affixed at Columbus, this 29th day of April, in the year of our Lord, one thousand nine hundred and Seventy.
 
 
 95
 /S/ James A. Rhodes Governor
 
 ATTEST:
 Ted W. Brown
 Secretary of State
 EXHIBIT II
 State of Ohio
 EXECUTIVE DEPARTMENT
 Office of the Governor
 Columbus
 PROCLAMATION
 
 96
 WHEREAS, on April 29, 1970, the Governor of Ohio as commander-in-chief issued verbal orders to the Adjutant General of Ohio directing him to call-up such units of the Ohio National Guard as in his judgment might be necessary or desirable to meet disorders and threatened disorders relating to wildcat strikes in the truck transportation industry, and to meet disorders or threatened disorders on campuses of Ohio State University in Franklin County, and campuses of other state-assisted universities; and
 
 
 97
 WHEREAS, pursuant to Section 5923.231 of the Ohio Revised Code, the Governor of Ohio thereafter on April 29, 1970 issued his Proclamation ordering into active service such personnel and units of the militia as the Adjutant General might designate "to maintain peace and order and to protect life and property throughout the State of Ohio;" and
 
 
 98
 WHEREAS, pursuant to the verbal orders aforementioned, the Adjutant General of Ohio called to active service units of the Ohio National Guard and assigned them variously to service in the City of Kent and on the campus of Kent State University in Portage County, and on the campus of Ohio State University in Franklin County. In addition to divers specific assignments related to restoration of order in the truck transportation industry; and
 
 
 99
 WHEREAS, it is desirable to make a written record, both events and the derivation of authority exercised by personnel and units of the Ohio National Guard in Portage County and Franklin County.
 
 
 100
 NOW, THEREFORE, I, JAMES A. RHODES, Governor and commander-in-chief of the militia of the State of Ohio, do hereby supplement my Proclamation of April 29, 1970, by specifying that personnel and units of the militia as may or may have been designated by the Adjutant General to maintain peace and order in the City of Kent and on the campus of Kent State University in Portage County, and on the campus of Ohio State University in Franklin County, are included in the call to active service hereinbefore referred to; and said Adjutant General and through him the commanding officer of any organization of said militia is and was ordered to take action necessary for the restoration of order in the city and on the campuses aforesaid. The military forces involved are and were ordered to act in aid of the civil authorities, and the Adjutant General was directed to consult with them to the extent necessary to determine the object to be accomplished, leaving the procedure of execution to the discretion of the commanding military officer designated by the Adjutant General.
 
 
 101
 The active military duty herein further delineated is again designated as service in time of public danger.
 
 
 102
 This Proclamation shall continue in force until revoked with my Proclamation of April 29, 1970.
 
 
 103
 (SEAL OF OHIO)
 
 
 104
 IN WITNESS WHEREOF, I have hereunto subscribed my name and caused the Great Seal of the State of Ohio to be affixed at Columbus, this 5th day of May, in the year of our Lord, one thousand nine hundred and seventy.
 
 
 105
 /S/ James A. Rhodes Governor
 
 ATTEST:
 Ted W. Brown
 Secretary of State
 
 106
 O'SULLIVAN, Senior Circuit Judge (concurring).
 
 
 107
 I concur in the opinion of Judge Weick, but I think it right to say this much more. The dissenting opinion states:
 
 
 108
 "The burden upon state officials to defend these suits-the nonmeritorious as well as the meritorious-is but a small price to pay for the protection of constitutional rights."
 
 
 109
 I cannot agree that what is being done in this case-suing all of the defendants, from the Governor of Ohio to the private soldiers of the Guard, in their individual capacities-"is but a small price to pay for the protection of constitutional rights." To escape the immunities which protect the state from suit, plaintiffs here seek to cast heavy burdens upon public officials and servants to pay out of their own pockets to provide for their defense for having sought, as their duties commanded, to protect those endangered by lawlessness.
 
 
 110
 In this case, we deal again with the ever-widening employment of Section 1983 for a purpose "not plainly apparent from its langauge,"[1] as such language was employed by the Congress when it adopted this Section in 1871 to combat some of the wrongs of our post-Civil War society. Currently, however, many courts have provided Section 1983 with new uses and much popularity-crowding today's courts with such volume of claimed causes of action as to seriously impair the judiciary's ability to meet its total burden of protecting American society.[2]
 
 
 111
 The dissent charges that the majority opinion "constitutes judicial repeal of an act of Congress." Certainly neither this Court nor any other has authority to repeal the Acts of Congress. Neither have we the right to amend the Acts of Congress by finding purposes in them outside the obvious Congressional intention in enacting them.
 
 
 112
 The pleadings in the case before us, by extravagant conclusional allegations and some dissembling, strive to avoid threshold dismissal. The complaints, with apparent deliberateness, omit any mention of what had been taking place on the campus of Kent State University that occasioned the presence there of the Ohio National Guard. The dissent asserts that the Guard was called to active duty on the day of the events here involved "to protect against violence arising from a wildcat strike in the truck transportation industry," but fails to mention that the Governor's May 5 Proclamation mentioned that the Guard's activation, by Proclamation of April 29, was also "to meet disorders or threatened disorders on the campuses of Ohio State University and campuses of other state-assisted Universities."
 
 
 113
 The pleadings would give the impression that the Ohio National Guard was on the Kent State campus for no reason whatever. It is asserted that the Governor's orders "obviously do not" have any relationship to the conditions prevailing on the Kent State campus. Thus, the pleaders would leave it that the Guard had no reason for being at Kent; that the Governor of Ohio with his soldiers entered upon the peace and quiet of Kent State campus as invaders, bent on killing innocent girls and boys.
 
 
 114
 It is charged that we-the majority -ignore the "wrongful death actions which are joined with the Section 1983 claims" because we fail to consider the complaint's allegations charging the Governor with "willful and wanton" killing of innocent young people. This writer does not hesitate to label such pleadings obvious contrivances to get into court without pretense of fair averment of causes of action.
 
 
 115
 The complaints, with transparent purpose, omit any mention of what had taken place in the City of Kent and on the campus of Kent State University. These are some of the allegations:
 
 
 116
 "At all times herein mentioned all defendants acted and conspired under color of statutes, ordinances, regulations, customs and usages of the State of Ohio." (Emphasis supplied.)
 
 
 117
 "Defendants ordered troops which they knew were equipped with guns loaded with live ammunition onto the Campus of Kent State University at a time when:
 
 
 118
 (a) Defendants knew there was no cause, or insufficient cause, for sending armed troops at said time into said place;" (Emphasis supplied.)
 
 
 119
 "Suddenly and without warning and without cause or justification, National Guard troops fired live ammunition at a large group of students and people, intentionally, willfully, wantonly and maliciously disregarding the lives and safety of students, spectators, passers-by * * * including Allison Krause, who was wounded by a bullet fired by a weapon of a national guardsman, * * *." (Emphasis supplied.)
 
 
 120
 "All acts herein mentioned were done individually and in conspiracy by these defendants and by other unknown persons with the specific intent of depriving plaintiff and plaintiff's decedent of their rights to Due Process of Law and to Equal Protection of the Laws, and these acts were all done by all defendants and other unknown persons under color of statutes, ordinances, regulations, customs and usages of the State of Ohio." (Emphasis supplied.)
 
 
 121
 The pleaders then go on to ask One Million Dollars compensatory damages and Five Million Dollars punitive damage. In another of the complaints, the pleaders ask Two Million Dollars compensatory and Two Million Dollars punitive damages.
 
 
 122
 We search in vain for anything in the several plaintiffs' pleadings to tell us what reason, pretentious or otherwise, caused the defendant President of Kent State and the Mayor of the City of Kent to ask the Governor of Ohio to order the Ohio National Guard to the scene of the tragedies we deal with here. A fair reading of plaintiffs' pleadings discloses an attempt to aver that, without any precedent events or causes, the Governor of Ohio willfully and wantonly ordered a company of the Ohio National Guard onto the Kent State campus, whose officers and men then proceeded deliberately and without cause to kill the several plaintiffs' decedents. The dissembling in plaintiffs' pleadings in this regard is portrayed by this Court's opinion in Morgan v. Rhodes, 456 F.2d 608. Such suit involved the events of April and May, 1970, on the campus of Kent State.
 
 
 123
 "At the outset, this complaint concedes that there was disorder which had not been terminated by normal civilian controls and that such disorders were continuing as of the time the Governor called out the troops. The complaint says:
 
 
 124
 '10. On or about May 1, 1970, there occurred certain disorders in the area of the Kent campus which resulted in the imposition of a curfew by the mayor of Kent. Thereafter, demonstrations and disorders continued in and about the Kent campus."' 456 F.2d at p. 610.
 
 
 125
 I believe also that what had been going on at Kent State and its environs preceding the tragic deaths of these young people is so widely and publicly known across the nation that this Court may take judicial notice of such events. 8 Cyc.Fed.Proc. Sec. 26.226 (3rd ed. 1968). The pleadings make no mention of the burning down of the ROTC Building on the campus of the University and the continued threats to persons and property-all a part of a state of insurrection that preceded and continued up to the very instant of the tragedy with which we deal. None of these things are even alluded to in the pleadings. For the Governor of Ohio to have refused to send the National Guard to the scene of these events and for the Guard and its men to have refused to deal with the situation confronting them, would have been dereliction of duty.
 
 
 126
 The pleadings presented to the District Judge were clearly contrived to hide rather than disclose the true background of the involved events-an attempt to predicate causes of action without disclosing their true subject matter. All of the foregoing confirms my belief that the pleadings do not disclose causes of action under Section 1983, and that this is not a case in which to fashion new rules to strike down traditional immunities.
 
 
 127
 CELEBREZZE, Circuit Judge (dissenting).
 
 
 128
 With due respect for my Brothers of the majority, I am unable to concur in their opinion or the result reached thereunder.
 
 
 129
 The majority concludes that the present suits are "in substance and effect actions against the State of Ohio" within the prohibition of the Eleventh Amendment. As discussed in Part II of this dissent, however, I find no authority to support such an extension of the Amendment, nor do I understand the majority's disregard for the Supreme Court's ruling in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Indeed, the majority's ad hoc application of the Eleventh Amendment would appear to bar all suits under 42 U.S.C. Sec. 1983, with its requirement that defendants thereunder be shown to have acted under color of state law.
 
 
 130
 The majority concludes that the present suits are also barred by the common law doctrine of executive immunity. The majority is totally oblivious to the fact, as discussed in Part III of this dissent, that this conclusion in effect constitutes judicial repeal of an act of Congress in deference to a common law rule which emerged after the enactment of Section 1983.
 
 
 131
 The majority reads Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410 (1909), as giving a governor and National Guardsmen total immunity from any form of judicial review of their actions. As discussed in Part IV of this dissent, the majority thus ignores not only the good faith requirement which was established by stipulation in the Moyer decision, but also the holding of Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932), that the courts can and must review allegations that the actions of a governor and National Guardsmen have exceeded the range of permitted, discretionary conduct justified by the exigencies of the situation.
 
 
 132
 The majority totally ignores the wrongful death actions which are joined with the Section 1983 claims in each of the complaints. As discussed in Part V of this dissent, the wrongful death actions in the Krause and Miller complaints are asserted under original, diversity, jurisdiction-rather than pendent jurisdiction, to which the majority makes a passing reference-requiring that these actions be disposed of under the applicable Ohio common law and statutes. While it quotes one of these statutes, O.R.C. Sec. 5923.27, in full, the majority fails to consider the fact that the present complaints specifically allege willful and wanton misconduct within the exception to the immunity granted under that statute.
 
 
 133
 Apart from these aspects of the majority opinion which I will discuss at some length in the remaining portions of this dissent, the majority has failed to recognize the status of these suits and the precedential effects of their illadvised pronouncements. These suits were dismissed for lack of jurisdiction without an answer to the complaints and without any evidence having been introduced by either party-save two proclamations issued by Defendant-Appellee Governor Rhodes, the first of which orders Ohio National Guardsmen to active duty to protect against violence arising from a wildcat strike in the truck transportation industry and the second of which was issued one day after the date of the deaths for which recovery is sought in the present suits. Even if these proclamations served as evidence of the conditions which prevailed on the Kent State Campus when the deaths occurred-which they obviously do not-they could not stand as conclusive proof of necessity in view of the Supreme Court's discussion in Sterling v. Constantin, 287 U.S. 378, 402-403, 53 S.Ct. 190 (1932). The majority opinion is nonetheless framed under the assumption that the violence and riotous conditions which, according to the media, may have prevailed on the Kent State Campus, have been established as proven facts for purposes of the present suits.
 
 
 134
 The shallowness of the majority's reasoning is illustrated in part by their reliance on this Court's decisions in Bright v. Nunn, 448 F.2d 245 (6th Cir. 1971), and Morgan v. Rhodes, 456 F.2d 608 (6th Cir. 1972), cert. granted sub nom., Gilligan v. Morgan, 409 U.S. 947, 93 S.Ct. 287, 34 L.Ed.2d 217 (U.S. Oct. 24, 1972) (in which I dissented because no injunctive relief or declaratory judgment could have been granted), undaunted by the fact that those suits were against defendants comparable to those named in the present cases yet jurisdiction over the Bright and Morgan suits was in no way precluded by either the Eleventh Amendment or the common law doctrine of executive immunity.
 
 
 135
 No less than my Brothers of the majority, I recognize the considerations which weigh against judicial review of the conduct of state officials and National Guardsmen in the face of civil disorders and sudden emergencies-when the latter conditions are proven. Unlike the majority, I believe that these considerations can be given appropriate weight without totally barring judicial review of possibly unwarranted deprivations of constitutional rights-particularly when the majority can sustain its position only by resorting to an unsupportable extension of the Eleventh Amendment and an impermissible application of the common law doctrine of executive immunity. As discussed in Part IV of this dissent, the Supreme Court's opinion in Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190 (1932), establishes workable guidelines for judicial review in this area which neither permit the courts to substitute their retrospective judgment for that of state officials acting in good faith in the face of an emergency nor require that the courts totally close their doors to claimed deprivations of constitutional rights when it is asserted that state action exceeded the limits of discretionary conduct justified under the circumstances.
 
 
 136
 I believe that the errors of the majority become self-evident from the following review of the suits and discussion of the issues raised by the rulings of the District Court and the majority opinion herein.
 
 I.
 
 137
 These are appeals from the District Court's dismissal of three suits for damages under 42 U.S.C. Sec. 1983. Each of the complaints also asserts a state law claim for wrongful death. Because the appeals involve the same questions of law, they were heard as companion cases under Rule 7(b) of this Court.
 
 
 138
 The suits were brought by the representatives of the estates of Allison Krause, Jeffrey Glenn Miller, and Sandra Lee Scheuer, who died as a result of gunshot wounds allegedly inflicted by members of the Ohio National Guard on the Kent State University Campus on May 4, 1970. The complaints, which were filed separately during the months of July through September, 1970, each named James Rhodes, Governor of the State of Ohio, Sylvester Del Corso, Adjutant General of the Ohio National Guard, and Robert Canterbury, Assistant Adjutant General of the Ohio National Guard, as defendants. The Miller and Scheuer complaints also named as defendants Harry D. Jones, a Major in the Ohio National Guard, John E Martin and Raymond J. Srp., captains in the Ohio National Guard, various unnamed officers and enlisted men of the Ohio National Guard, and Robert White, President of Kent State University. The Miller complaint alone named Alexander Stevenson, a member of the Ohio National Guard, as an additional defendant.
 
 
 139
 The complaints assert that the decedents, Allison Krause, Jeffrey Glenn Miller, and Sandra Lee Scheuer, were enrolled as students at Kent State University in May 1970 and that none of the decedents was engaged in any riotous, violent, or provocative conduct at the time the fatal wounds were inflicted on May 4, 1970.
 
 
 140
 Although the defendants named in the three complaints are not identical and the allegations contained in the complaints vary some what as to the specific conduct challenged, those allegations can be generally summarized as follows: (1) Governor Rhodes intentionally, willfully, wantonly and recklessly ordered Ohio National Guard troops to duty on the Kent State campus when such action was unnecessary; permitted the troops to carry loaded weapons, thus increasing the risk that innocent persons would be injured and killed; permitted the troops to shoot at persons without justification; and ordered the troops to break up all assemblies, whether lawful or unlawful; (2) Adjutant General Del Corso and Assistant Adjutant General Canterbury intentionally, willfully, wantonly and recklessly caused and ordered inadequately trained and incapable Ohio National Guard troops to carry loaded weapons, thus increasing the risk of shooting innocent persons; to shoot at persons without legal justification; and to engage in actions which increased the risk of injury and death to persons on and near the Kent State campus; (3) Major Jones and Captains Martin and Srp intentionally, willfully, wantonly and recklessly caused and ordered Ohio National Guard troops to shoot at and in the direction of persons without legal justification and to engage in actions which increased the risk of injury and death to persons on or near the Kent State campus; or, alternatively, these defendants intentionally, willfully, wantonly and recklessly failed to restrain the troops under their command from shooting and causing others to shoot, without legal justification, at and in the direction of persons on and near the Kent State campus; (4) the unnamed Ohio National Guard members willfully, wantonly and recklessly shot at and in the direction of persons on the Kent State campus without legal justification and caused others to do so; or, alternatively, if these unnamed Guardsmen were ordered to shoot their weapons, such orders were patently unlawful and did not legally justify such shooting; (5) President White intentionally, willfully, wantonly and recklessly failed to take any actions to control the Ohio National Guard activities on the Kent State campus or to decrease the risk of injury and death when such actions could have decreased that risk.
 
 
 141
 It is further asserted that the conduct of the Defendants-Appellees, as set forth above, was undertaken individually and in concert under color of state law, in deprivation of the decedents' rights to due process and equal protection, and that Plaintiffs-Appellants are therefore entitled to compensatory and punitive damages under 42 U.S.C. Sec. 1983. The same conduct of Defendants-Appellees is asserted as the basis for compensatory and punitive damages under the state wrongful death claims.
 
 
 142
 In a single Memorandum and Order, the District Court granted Defendants-Appellees' motions to dismiss the three suits under Rule 12(b)(1), F.R.C.P., for lack of subject matter jurisdiction. The District Court made the following findings and conclusions in support of its dismissal:
 
 
 143
 "The Eleventh Amendment to the United States Constitution prohibits this court from exercising jurisdiction in this case and this court so finds.
 
 
 144
 "All defendants, including President White, are sued in their official capacities and sovereign immunity so extends."
 
 II.
 
 145
 The federal claim in each of the three complaints is asserted under 42 U.S.C. Sec. 1983, which provides as follows:
 
 
 146
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (Emphasis added.)
 
 
 147
 Acknowledging that the complaints asserted claims against the individual defendants under Section 1983, the District Court nonetheless ruled that because each of the several defendants was being sued in his representative capacity as a public or military official and/or an agent of the sovereign State of Ohio, the suits were "essentially against the State of Ohio." The State of Ohio having failed to consent to such actions against it, the District Court concluded that the suits are barred by the Eleventh Amendment. This conclusion and the majority's endorsement of it are in direct conflict with the applicable case law.
 
 
 148
 In Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court was faced with contentions, similar to those of Defendants-Appellees here, that a suit in federal court against a state official was in essence a suit against the state, which was barred by the Eleventh Amendment. There a federal Circuit Court had enjoined the Attorney General of the State of Minnesota from instituting any action or proceeding to compel obedience to, or compliance with, a Minnesota statute or to enforce the remedies and penalties thereunder, pending the Court's ruling on the constitutionality of the statute. The Supreme Court ruled that the Eleventh Amendment did not bar the Circuit Court's injunction against the state attorney general, notwithstanding the fact that he was sued in his capacity as a state official:
 
 
 149
 "If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States." 209 U.S. at 159-160, 28 S.Ct. at 454.
 
 
 150
 Through its decision in Ex parte Young, the Supreme Court resolved what might otherwise have stood as a conflict between the Eleventh Amendment and suits in a federal court by citizens seeking to vindicate their rights under the Fourteenth Amendment. As was recently noted by Mr. Justice Brennan, the Young decision-coupled with what are now 42 U.S.C. Sec. 1983 and 28 U.S.C. Secs. 1343(3), 1331-firmly established the federal courts as the primary guardians against state interference with constitutional rights:
 
 
 151
 "Ex parte Young was the culmination of efforts by this Court to harmonize the principles of the Eleventh Amendment with the effective supremacy of rights and powers secured elsewhere in the Constitution. During the years between Osborn [Osborn v. United States Bank, 9 Wheat. 738, 6 L. Ed. 204 (1824)] and Young, and particularly after the Civil War, Congress undertook to make the federal courts the primary guardians of constitutional rights. . . . The principal foundations of the expanded federal jurisdiction in constitutional cases were the Civil Rights Act of 1871, 17 Stat. 13, which in Sec. 1 empowered the federal courts to adjudicate the constitutionality of actions of any person taken under color of state statute, ordinance, regulation, custom, or usage, see 42 U.S.C. Sec. 1983, 28 U.S.C. Sec. 1343(3), and the Judiciary Act of 1875, 18 Stat. 470, which gave lower federal courts general federal-question jurisdiction, see 28 U.S.C. Sec. 1331. These two statutes, together, after 1908, with the decision in Ex parte Young, established the modern frame-work for federal protection of constitutional rights from state interference. That framework has been strengthened and expanded by subsequent acts of Congress and subsequent decisions of this Court." Perez v. Ledesma, 401 U.S. 82, 106-107, 91 S.Ct. 674, 687-688, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring in part, dissenting in part).
 
 
 152
 The District Court's determination that the present suits under Section 1983 are barred by the Eleventh Amendment cannot be upheld in the face of the Supreme Court's decision in Ex parte Young. No less than the suits for injunctive relief which were before the Circuit Court in Young, the present actions under Section 1983 seek redress of asserted infringements of constitutional rights by state officials. To hold that the present suits against state officials under Section 1983 are barred by the Eleventh Amendment would in effect overrule the Supreme Court's holding in Ex parte Young and destroy Section 1983 as a tool by which federal courts are to guard against state interference with constitutional rights.
 
 
 153
 In its opinion in Ex Parte Young, supra, 209 U.S. at 150-152, 28 S.Ct. 441, the Supreme Court reviewed the scope of the Eleventh Amendment as it had then been construed. Clearly a citizen's suit in which a state is a named party cannot be entertained by a federal court. See Osborn v. United States Bank, 9 Wheat. 738, 846, 857, 6 L.Ed. 204 (1824). Nor may a federal court hear a suit by a citizen against a governor or other state officer, in his official capacity, for moneys in the state treasury. Governor of Georgia v. Madrazo, 1 Pet. 110, 122, 123, 7 L.Ed. 73 (1828). And a citizen's suit against state officials, where the relief sought would require the state's specific performance of a contract, is likewise barred by the Eleventh Amendment in the absence of the state's consent. Hagood v. Southern, 117 U.S. 52, 67, 6 S. Ct. 608, 29 L.Ed. 805 (1886); In re Ayers, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887).
 
 
 154
 The cases relied upon by the District Court in support of its conclusion that the present suits are barred by the Eleventh Amendment clearly fall within the above categories. The District Court based its ruling on the following cases: Missouri v. Fiske, 290 U.S. 18, 54 S.Ct. 18, 78 L.Ed. 145 (1933) (ancillary and supplemental bill seeking an injunction against a state, in its own name, restraining it from prosecuting proceedings in a state court); Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945) (suit against a state agency for the refund of taxes from the state treasury); Great Northern Ins. Co. v. Read, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944) (suit against a state insurance commissioner to recover taxes from the state treasury); Louisiana v. Jumel, 107 U.S. 711, 2 S. Ct. 128, 27 L.Ed. 448 (1882) (suit against state officials to require specific performance of contracts with the state and appropriation of state treasury funds); Parden v. Terminal Railway Co., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964) (FELA suit against a state agency for damages to be paid from the state treasury; state's operation of an interstate railway constituted consent to such a suit.)[1] Likewise, Ex parte New York, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921)-the only Eleventh Amendment case cited as support for the majority's holding-involved an attempt to join the New York Superintendent of Public Works as a defendant in three admiralty suits, under which any judgment would be satisfied out of the property or treasury of the State.
 
 
 155
 In several of these cases the Supreme Court expressly acknowledged that it was not faced with a suit against a state official under his personal liability for his wrongful acts:
 
 
 156
 "The ancillary and supplemental bill is brought by the respondents directly against the State of Missouri. It is not a proceeding within the principle that suit may be brought against state officers to restrain an attempt to enforce an unconstitutional enactment. That principle is that the exemption of states from suit does not protect their officers from personal liability to those whose rights they have wrongfully invaded." Missouri v. Fiske, supra, 290 U.S. at 26, 54 S.Ct. at 20.
 
 
 157
 "In such cases [where relief is sought under general law from the wrongful acts of officials] the immunity of the sovereign does not extend to wrongful individual action and the citizen is allowed a remedy against the wrongdoer personally." Great Northern Insurance Co. v. Read, supra, 322 U.S. at 51, 64 S.Ct. at 875."Where relief is sought under general law from wrongful acts of state officials, the sovereign's immunity under the Eleventh Amendment does not extend to wrongful individual action, and the citizen is allowed a remedy against the wrongdoer personally." Ford Motor Co. v. Department of Treasury of Indiana, supra, 323 U.S. at 462, 65 S.Ct. at 350.
 
 
 158
 The present actions under Section 1983 are not against the State of Ohio as a named defendant; they do not seek money damages from the State's treasury; nor would the requested relief, if granted, require specific performance of a contract by the State. Rather, these actions are brought against the named defendants, as individuals under their personal liability for conduct which allegedly deprived Plaintiffs-Appellants' decedents of their constitutional rights. The suits are of the type which the Supreme Court was careful to exclude from the Eleventh Amendment's prohibition in the cases discussed above and in its landmark decision in Ex parte Young.
 
 
 159
 Summarily dismissing the Supreme Court's decision in Ex parte Young as "inapposite" and ignoring the scope ascribed to the Eleventh Amendment by the above cases, the majority holds that the "nature and effect" of the present suits bring them within that Amendment's prohibition. The majority fails to consider that a comparable "nature and effect" is a prerequisite for any suit under Section 1983, with its requirement that defendants thereunder be shown to have acted under color of state law. Any question of Section 1983's constitutionality which thus emerges from the majority's approach, is averted by the fact that Section 1983 provides for redress against persons under their personal liability, and suits thereunder are theretofore not within the established scope of the Eleventh Amendment. See Sostre v. McGinnis, 442 F.2d 178, 205 (2d Cir. 1971).
 
 III.
 
 160
 The District Court apparently based its dismissal of these suits solely on their asserted conflict with the Eleventh Amendment. Several of the cases cited by the District Court, however, dealt with the personal immunity of public officials rather than the Eleventh Amendment or sovereign immunity. Whereas the District Court may thus have merely confused the concepts of personal immunity and sovereign immunity as the latter is incorporated in the Eleventh Amendment, the majority expressly holds that the present suits are barred not only by the Eleventh Amendment but also by the common law doctrine of executive immunity.
 
 
 161
 Section 1983 contains no provision which can be construed as establishing immunity for any defendants thereunder.[2] As was observed by the Court of Appeals for the Second Circuit in Jobson v. Henne, 355 F.2d 129, 133 (2d Cir. 1966):
 
 
 162
 "The Civil Rights Acts in general, and Sec. 1983 in particular, are cast in terms so broad as to suggest that in suits brought under these sections common law doctrines of immunity can never be a bar."
 
 
 163
 Reflecting upon the common law immunities which were firmly established prior to the enactment of Section 1983, however, the Supreme Court has imparted immunity to two specific classes of public officials who might otherwise be liable under this statute for their official acts. In Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), the Supreme Court held that "[t]he privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings," with its "taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries," was not abridged by the Civil Rights Act of 1871. 341 U.S. at 372, 71 S.Ct. at 786. Therefore, members of a senate committee of the California Legislature were held to be immune from suit under 8 U. S.C. Secs. 43 and 47(3) [now 42 U.S.C. Secs. 1983 and 1985(3)]. And in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L. Ed.2d 288 (1967), the Supreme Court held that Section 1983 did not abrogate the well established common law doctrine of "immunity of judges from liability for damages for acts committed within their judicial jurisdiction." 386 U.S. at 554, 87 S.Ct. at 1217.
 
 
 164
 Beyond the immunity for legislators and judges which the Supreme Court has expressly recognized under Section 1983, there exists no authority for lower federal courts to further restrict the statute by applying common law notions of executive immunity to suits brought thereunder. The common law doctrine of executive immunity is at odds with the purpose or, more accurately, the very existence of Section 1983 as a remedy against deprivations of constitutional rights. In holding that the doctrines of legislative and judicial immunity are applicable to suits under Section 1983, the Supreme Court emphasized that these common law doctrines were firmly established in England and this country when Congress enacted the Civil Rights Act of 1871. The Supreme Court therefore reasoned that Congress would not have intended to abrogate these immunities under Section 1983 without expressly so providing:
 
 
 165
 "We cannot believe that Congress-itself a staunch advocate of legislative freedom-would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language before us." Tenney v. Brandhove, supra, 341 U.S. at 376, 71 S.Ct. at 788.
 
 
 166
 "The immunity of judges for acts within the judicial role is equally well established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine." Pierson v. Ray, 386 U.S. at 554-555, 87 S.Ct. at 1218.
 
 
 167
 The doctrine of executive immunity is not so well established, having been recognized in neither England nor this Country until some 20 years after the enactment of Section 1983. See Barr v. Matteo, 360 U.S. 564, 581-582, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (Warren, C. J., dissenting). It therefore cannot be assumed that Congress intended this doctrine to apply to suits under Section 1983.
 
 
 168
 Another compelling reason for not applying a doctrine of executive immunity in suits under Section 1983 lies in the simple fact that such a doctrine, if added to the legislative and judicial immunity presently recognized under the statute, would totally circumscribe the remedy provided in Section 1983. It is difficult to envision what, if any, remedy would remain under Section 1983 if, in addition to those persons who can bring themselves under legislative or judicial immunity, the broad class of persons who might be characterized as state executive officials is also immune from suit under the statute. Whereas Congress may have intended that the doctrines of legislative and judicial immunity would apply to suits under Section 1983, I assume that Congress did not intend that the remedy under the statute would be so thoroughly frustrated, or in effect nullified, by the additional common law doctrine of executive immunity. The rule that statutes in derogation of the common law must be narrowly construed certainly does not require, nor authorize, courts to apply a common law doctrine which totally undercuts the statute-particularly when that common law doctrine was not yet recognized when the statute was enacted.
 
 
 169
 The majority relies on the case of Martone v. McKeithen, 413 F.2d 1373 (5th Cir. 1969), and the cases cited therein, in support of its conclusion that the present suits are barred by the doctrine of executive immunity. In Martone the Court of Appeals held that the Governor of Louisiana was immune from a damage suit[3] under Section 1983 for acts within the sphere of his executive activity. By substituting "the immunity of public officers from suit" within the following discussion of judicial immunity in Pierson v. Ray, 386 U. S. at 554, 87 S.Ct. at 1218, the Martone court cited that decision as support for applying a broad rule of official immunity under Section 1983:
 
 
 170
 "'We do not believe that this settled principle of [the immunity of public officers from suit] was abolished by Sec. 1983, which makes liable "every person" who under color of law deprives another person of his civil rights. The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities."' 413 F.2d at 1375.
 
 
 171
 As discussed above, such a distorted reading of Pierson v. Ray would result in a wholesale abolition of the remedy prescribed under Section 1983.
 
 
 172
 In support of its holding that the Governor was immune from a damage suit under Section 1983, the Martone Court cited Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335 (1959), Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949), and Norton v. McShane, 332 F.2d 855 (5th Cir. 1964)-cases upon which the majority herein similarly relies in support of their conclusion that Defendants-Appellees are clothed with executive immunity.
 
 
 173
 In Barr v. Matteo, the Supreme Court held that the Acting Director of the Office of Rent Stabilization was protected by an absolute immunity from a civil action for libel arising from his issuance of an official press release. The suit was not brought under Section 1983, no deprivation of constitutional rights was asserted, nor was the defendant a person acting under color of state law. The decision therefore cannot be said to support the application of a doctrine of executive immunity in suits against state officials under Section 1983.
 
 
 174
 Gregoire v. Biddle involved a damage suit under what are now Sections 1983 and 1985, 42 U.S.C., as well as common law, against federal officials for false arrest. Holding that all defendants had absolute immunity, the District Court had dismissed the suit. The Court of Appeals affirmed the dismissal of the Section 1983 claim because none of the defendants had acted "under color of" state law-not because absolute immunity was applicable to suits under the statute.[4] 177 F.2d at 581-582. Moreover, the Court of Appeals' broad language upholding the absolute immunity of the federal defendants under the common law claims has been modified by the recent ruling in Bivens v. Six Unknown Named Agents of the F.B.I., 456 F.2d 1339 (2d Cir. 1972), wherein the same Court held that F.B.I. agents were not immune from damage suits for their allegedly unreasonable search and arrest without probable cause.
 
 
 175
 In Norton v. McShane the plaintiffs similarly sought damages under 42 U.S. C. Secs. 1983 and 1985(3) and common law from certain federal officials, including a deputy United States Marshal and his supervisors for their allegedly unlawful arrests. Applying the absolute immunity of federal officials acting within the scope of their authority, as prescribed in Barr v. Matteo and Gregoire v. Biddle, supra, the Court of Appeals affirmed the lower Court's dismissal of the common law actions. As in Gregoire v. Biddle, however, the dismissal of the action under Section 1983 was affirmed because none of the defendants had acted "under color of" state law. The question of official or executive immunity under Section 1983 therefore was not before the Court. The Court did suggest in dictum, however, that the doctrine of official immunity "may be given more limited application in those suits [under Section 1983] than it has been given at common law." 332 F.2d at 861.
 
 
 176
 Thus, none of the decisions cited by the Court in Martone v. McKeithen and relied on by the majority herein ruled upon the applicability of official or executive immunity to suits under Section 1983. Indeed, the same Court's opinion in Norton v. McShane, supra, recognized in dictum that the doctrine of official immunity, as applied at common law, may be given more limited application in suits under Section 1983. 332 F.2d at 861.
 
 
 177
 Moreover, the Court of Appeals for the Fifth Circuit (which rendered both the Martone and Norton decisions, supra) has recently ruled in Roberts v. Williams, 456 F.2d 819 (5th Cir.) cert. denied, 404 U.S. 866, 92 S.Ct. 83, 30 L. Ed.2d 110 (1971), that the absolute immunity which has been afforded to federal and state officials under common law is not applicable in suits against state officials under Section 1983. 456 F.2d at 830-31. There a 14-year old inmate of a Mississippi county prison farm sued the superintendent of the farm and the individual members of the county board of supervisors under Section 1983 and common law, seeking damages for a shotgun wound inflicted by a "patently incompetent" trusty guard at the farm. The District Court had dismissed the complaint with respect to the members of the board of supervisors, holding that they were immune from suit under both the Section 1983 and common law claims.[5] While it affirmed the District Court's determination that the board members were immune from the common law actions, the Court of Appeals rejected the application of common law immunity to the claim under Section 1983. Significantly, the Roberts Court acknowledged that absolute common law immunity has been recognized for federal officials [citing Barr v. Matteo and Norton v. McShane, supra], but it ruled that such immunity cannot operate to bar suits against state and local officials (other than judges and legislators) under Section 1983.[6] Id. See also Alexander v. Nosser, 438 F.2d 183, 200-202 (5th Cir. 1971), modified on other grounds, 456 F.2d 835 (en banc) (police chief, fire chief, and prison warden had no common law official immunity under Section 1983); Carter v. Carlson, 144 U.S.App.D.C. 388, 447 F.2d 358, 365 (1971) cert. granted sub nom. District of Columbia v. Carter, 404 U.S. 1014, 92 S.Ct. 683, 30 L.Ed.2d 661 (1972) (rejecting common law official immunity as a bar to suits under Section 1983 against a police captain and a police chief); McLaughlin v. Tilendis, 398 F. 2d 287, 290 (7th Cir. 1971) (superintendent of schools and elected members of school board were not protected by common law, official immunity in a damage suit under Section 1983); Sostre v. McGinnis, 442 F.2d 178, 205 n.51 (2d Cir. 1971) (state administrative officials were not entitled to immunity from damage judgment which has been extended to judges and legislators under Section 1983).
 
 
 178
 I likewise conclude that the common law doctrines of executive and official immunity, as recognized in Barr v. Matteo and Gregoire v. Biddle, supra, are inapplicable in suits against state officials under Section 1983. This is the only result which averts judicial repeal of the remedy which Congress has expressly provided under that statute-a statutory remedy which the Barr v. Matteo and Gregoire v. Biddle courts did not have to consider when they gave recognition to their respective rules of common law, personal immunity.
 
 
 179
 In reaching this conclusion I am not unmindful of the policy considerations which support the recognition of a general rule of official immunity outside the context of suits under Section 1983. This policy was set forth by Judge Learned Hand in Gregoire v. Biddle, supra, 177 F.2d at 581, discussing the absolute immunity of federal officials:[7]
 
 
 180
 "The justification for [granting absolute immunity to federal executives] is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith." 177 F.2d at 581.
 
 
 181
 See also Barr v. Matteo, supra, 360 U.S. at 571, 79 S.Ct. 1335, 3 L.Ed.2d 1434; Norton v. McShane, supra, 332 F.2d at 857-859.
 
 
 182
 However compelling such considerations may be in the context of common law suits against federal or state officials, they cannot override the remedy against state officials which Congress has expressly provided in Section 1983. That statute is one of the tools with which Congress chose to make federal courts the primary guardians against state interference with constitutional rights. See Perez v. Ledesma, 401 U.S. 82, 106-107, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring in part, dissenting in part). I find no countervailing legislation through which Congress-by adopting court-made rules of personal immunity-has chosen to protect state officials from burdensome suits or to insure their freedom from inhibitions in executing their official duties.
 
 
 183
 Moreover, the policy considerations set forth in Gregoire v. Biddle, as quoted above, relate to the need to protect public officials from the full gamut of common law suits to which they might otherwise be exposed. Indeed, the Supreme Court's broad pronouncements regarding executive immunity in Barr v. Matteo, supra, were rendered in the context of a simple libel suit against the defendant in that case. In contrast to the wide range of common law suits which public officials might face in the absence of broad common law immunities, Section 1983 exposes state officials to a relatively restricted class of suits-actions to redress deprivations of constitutional rights. In this context, the policies supporting the doctrines of official or executive immunity are less persuasive. The burden upon state officials to defend against these suits-the nonmeritorious as well as the meritorious-is but a small price to pay for the protection of constitutional rights. And it is a fundamental precept of this Nation that public officials should exercise the highest degree of care in discharging their duties when the constitutional rights of citizens are at stake. Moreover, it certainly cannot be said that Congress was ignorant of the burden it was placing upon state officials when it established a remedy to protect against state interference with the constitutional rights of citizens.
 
 
 184
 Nor can it be said that the conduct of a state official in discharging his discretionary duties is of such a nature that judicial review of the constitutionality of that conduct must be barred. Nowhere in the Constitution do I find that the rights guaranteed therein are to be subordinate to the need for unhampered exercise of discretion by state officials. As real as this need may be, it is not so absolute that suits under Section 1983 to redress asserted deprivations of constitutional rights by state officials must be barred in deference to it. Rather than immunizing state officials from suit under Section 1983, the discretionary nature of their conduct should relate only to the question of ultimate liability under that statute for actions which were unreasonable under the circumstances.[8]
 
 
 185
 In this respect I recognize that the actions challenged in the present complaints-to the extent that any of those actions might be shown to have been directly related to the quelling of a civil disturbance-demand the utmost in discretion and immediate judgments in the face of sudden exigencies. As discussed in Part IV of this dissent, in Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410 (1909) and Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932), the Supreme Court has expressly provided state officials with a permitted range of discretionary conduct in the face of civil disorders and, as to actions within that permitted range, has restricted judicial review to the narrow question of whether the state officials acted in good faith and in the honest belief that their actions were necessary to quell the disturbance. Beyond this restriction on judicial review of acts within a permitted range of discretion, neither Moyer v. Peabody nor Sterling v. Constantin established any broad rule of personal immunity for state officials acting to quell civil disorders. Such a rule of personal immunity, unrelated to whether the challenged conduct was within the range of actions justified by the circumstances, would render meaningless the language in Sterling v. Constantin respecting a permitted range of justifiable conduct and would directly contravene the established rule set forth in that opinion:
 
 
 186
 "What are the allowable limits of military discretion and whether or not they have been overstepped in a particular case, are judicial questions. . . . There is no ground for the conclusion that military orders in the case of insurrection have any higher sanction or confer any greater immunity." 287 U.S. at 401, 53 S.Ct. at 196.
 
 
 187
 I would therefore hold that the present suits under Section 1983 are not barred by any notions of common law executive immunity. The majority's conclusion to the contrary renders Section 1983 a nullity and recognizes the state's interest in the immunity of its officials as being superior to the constitutional rights of individuals.
 
 IV.
 
 188
 The majority herein-as did the District Court-relies in part on the Supreme Court's decision in Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235 (1909), for the proposition that Defendants-Appellees' good faith actions in the face of a civil disorder are beyond judicial review. In that case, the Governor of Colorado had declared a county to be in a state of insurrection-presumably because of existing labor unrest and apprehension of trouble from members of the Western Federation of Miners, of which Moyer was president. Apparently by order of the Governor, members of the State's National Guard arrested Moyer and imprisoned him for a period of two and one-half months, during which time no charges were filed against him and no attempt was made to bring him before the state courts, which were in full operation during the incident.
 
 
 189
 After his release from custody, Moyer brought an action for damages against the Governor (then out of office) under R.S. Sec. 1979 (now 42 U.S.C. Sec. 1983), alleging that the arrest and incarceration were without probable cause, in violation of Moyer's Fourteenth Amendment rights. The Circuit Court dismissed the complaint for lack of jurisdiction.
 
 
 190
 The Supreme Court affirmed the dismissal on the ground that the complaint failed to state a claim under R.S. Sec. 1979.
 
 
 191
 "So long as such arrests are made in good faith and in the honest belief that they are needed in order to head the insurrection off, the governor is the final judge and cannot be subjected to an action after he is out of office, on the ground that he had not reasonable ground for his belief." 212 U.S. at 85, 29 S.Ct. at 236.
 
 
 192
 Even if it could be said that this subjective good faith test prescribed in the Moyer decision sets the limits for judicial review in the present cases, that test would not support the District Court's dismissal of the present complaints. Moyer at no time asserted that the Governor's conduct was in bad faith or that it was not directed toward the quelling of an insurrection. Rather, the parties agreed that the arrest and detention were undertaken in good faith in the face of an actual insurrection: "The facts that we are to assume are that a state of insurrection existed and that the governor, without sufficient reason, but in good faith, in the course of putting the insurrection down, held the plaintiff until he thought that he safely could release him." 212 U.S. at 84,[9] 29 S.Ct. at 236.
 
 
 193
 The present complaints do not stipulate that the alleged conduct of the defendants was undertaken in good faith or that it was directed at the quelling of an actual insurrection or disorder. To the contrary, the complaints assert that the action or inaction of all defendants was intentional, willful, wanton, reckless, and unjustified under the circumstances. Because the suits were dismissed on the complaints for lack of jurisdiction, no evidence was introduced to support or refute these allegations. Therefore, under the above-quoted language from the Moyer opinion alone, the present suits would have to be remanded for further proceedings in order to determine whether the alleged actions of the defendants, if proven, were undertaken in "good faith and in the honest belief" that they were necessary to head off an actual insurrection.
 
 
 194
 In view of the Supreme Court's subsequent decision in Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190 (1932), however, it is clear that the "good faith and honest belief" test prescribed in Moyer v. Peabody cannot be broadly construed as a general standard of judicial review of the actions of a governor and National Guardsmen in the face of an insurrection or civil disorder. In Sterling, the Governor of Texas-under his declaration of martial law-had ordered the state's National Guard to seize and control privately owned oil wells in order to impose production restrictions. Finding that the evidence did not support the Governor's and National Guard officials' asserted belief that their actions were necessary to prevent a threatened insurrection, a three-judge District Court permanently enjoined the Governor and National Guard officers from enforcing their executive and military orders and otherwise interfering with the production of oil.
 
 
 195
 In upholding the three-judge Court's injunction, the Supreme Court noted that the question before it did not relate to the "permissible scope of determinations of military necessity in all their conceivable applications to actual or threatened disorder and breaches of the peace," nor did it relate to the "quelling of disturbances and the overcoming of unlawful resistance to civil authority." 287 U.S. at 401, 53 S.Ct. at 196. Nonetheless, it is clear from the precise language of the Sterling opinion that the "good faith and honest belief" test suggested by the Moyer v. Peabody decision cannot stand as a general limitation on judicial review in cases where the existence of actual civil disorder or insurrection is established.
 
 
 196
 At the outset the Supreme Court in Sterling struck down the notion that a governor or other state official, relying on his personal views of necessity,[10] may create an irrebuttable presumption-unreviewable by the courts-that his actions and those of the National Guard were justified under the circumstances:
 
 
 197
 "And when the federal court, finding his action to have been unjustified by any existing exigency, has given the relief appropriate in the absence of other adequate remedy, appellants assert that the court was powerless thus to intervene, and that the Governor's order had the quality of a supreme and unchallengable edict, overriding all conflicting rights of property and unreviewable through the judicial power of the federal government.
 
 
 198
 "If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, the futility of which the State may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity. Under our system of government, such a conclusion is obviously untenable. There is no such avenue of escape from the paramount authority of the Federal Constitution. When there is a substantial showing that the exertion of state power has overridden private rights secured by that Constitution, the subject is necessarily one for judicial inquiry in an appropriate proceeding directed against the individuals charged with the transgression. To such a case the federal judicial power extends (Art. III, Sec. 2), and, so extending, the court has all the authority appropriate to its exercise." 287 U.S. at 397-398, 53 S.Ct. at 195.
 
 
 199
 At a later point in its opinion, the Supreme Court further assailed the defendants' assertion that their action under a proclamation of martial law "can be taken as conclusive proof of its own necessity and must be accepted as in itself due process of law":
 
 
 200
 "Appellants' contentions find their appropriate answer in what was said by this Court in Ex parte Milligan, 4 Wall. 2, 124 [18 L.Ed. 281], a statement as applicable to the military authority of the state in the case of insurrection as to the military authority of the nation in time of war: 'The proposition is this: That in a time of war the commander of an armed force (if in his opinion the exigencies of the country demand it, and of which he is to judge), has the power, within the lines of his military district, to suspend all civil rights and their remedies, and subject citizens as well as soldiers to the rule of his will; and in the exercise of his lawful authority cannot be restrained, except by his superior officer or the President of the United States. If this position is sound to the extent claimed, then when war exists, foreign or domestic, and the country is subdivided into military departments for mere convenience, the commander of one of them can, if he chooses, within his limits, on the plea of necessity, with the approval of the Executive, substitute military force for and to the exclusion of the laws, and punish all persons, as he thinks right and proper, without fixed or certain rules. The statement of this proposition shows its importance; for, if true, republican government is a failure, and there is an end of liberty regulated by law. Martial law, established on such a basis, destroys every guarantee of the Constitution, and effectually renders the military independent of and superior to the civil power. . . . Civil Liberty and this kind of martial law cannot endure together; the antagonism is irreconcilable and, in the conflict, one or the other must perish."' 287 U.S. at 402-403, 53 S.Ct. at 197.
 
 
 201
 The Sterling Court then turned to consider the countervailing discretion which must be afforded to state officials under their duty to suppress violence and maintain order.[11] Within this context, the Supreme Court discussed its earlier decision in Moyer v. Peabody and prescribed the limitations which must be placed on the language of that opinion:
 
 
 202
 "The nature of the power [of the Governor to call up the militia to suppress insurrection and disorder] also necessarily implies that there is a permitted range of honest judgment as to the measures to be taken in meeting force with force, in suppressing violence and restoring order, for, without such liberty to make immediate decisions, the power itself would be useless. Such measures, conceived in good faith, in the face of the emergency, and directly related to the quelling of the disorder or the prevention of its continuance, fall within the discretion of the executive in the exercise of his authority to maintain peace. Thus, in Moyer v. Peabody, supra, the Court sustained the authority of the Governor to hold in custody temporarily one whom he believed to be engaged in fomenting disorder, and right of recovery against the Governor for the imprisonment was denied. The Court said that, as the Governor 'may kill persons who resist,' he 'may use the milder measure of seizing the bodies of those whom he considers to stand in the way of restoring peace. Such arrests are not necessarily for punishment, but are by way of precaution to prevent the exercise of hostile power. So long as such arrests are made in good faith and in the honest belief that they are needed in order to head the insurrection off, the governor is the final judge and cannot be subjected to an action after he is out of office on the ground that he had not reasonable ground for his belief.' In that case it appeared that the action of the Governor had direct relation to the subduing of the insurrection by the temporary detention of one believed to be a participant, and the general language of the opinion must be taken in connection with the point actually decided. Cohens v. Virginia, 6 Wheat. 264, 399, [5 L.Ed. 257]; Carroll v. Carroll's Lessee, 16 How. 275, 287, [14 L.Ed. 936]; Myers v. United States, 272 U.S. 52, 142, [47 S.Ct. 21, 71 L.Ed. 160].
 
 
 203
 "It does not follow from the fact that the executive has this range of discretion, deemed to be a necessary incident of his power to suppress disorder, that every sort of action the Governor may take, no matter how unjustified by the exigency or subversive of private right and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat. The contrary is well established. What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions. Thus, in the theatre of actual war, there are occasions in which private property may be taken or destroyed to prevent it from falling into the hands of the enemy or may be impressed into the public service, and the officer may show the necessity in defending an action for trespass. 'But we are clearly of opinion,' said the Court speaking through Chief Justice Taney, 'that in all of these cases the danger must be immediate and impending; or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for. . . . Every case must depend on its own circumstances. It is the emergency that gives the right, and the emergency must be shown to exist before the taking can be justified.' Mitchell v. Harmony, 13 How. 115, 134, [14 L.Ed. 75]. See, also, United States v. Russell, 13 Wall. 623, 628, [20 L.Ed. 474]. There is no ground for the conclusion that military orders in the case of insurrection have any higher sanction or confer any greater immunity." 287 U.S. at 399-401, 53 S.Ct. at 196. (emphasis added).
 
 
 204
 The foregoing discussion in Sterling v. Constantin clearly precludes the application of the "good faith and honest belief" language of Moyer v. Peabody as a general standard of judicial review in suits challenging the actions of a governor and National Guardsmen even when it is established from the evidence that those actions were directly related to the quelling of a civil disorder or insurrection. As set forth in the above-quoted portion of the Sterling opinion, the language of Moyer v. Peabody relates to judicial review of those actions of state officials only when it is established that those actions were within the "permitted range of honest judgment as to the measures to be taken in meeting force with force, in suppressing violence and restoring order. . . ." As such, the Moyer language is simply a statement of the deference which must be given to state officials' good faith judgments and actions within a permitted range of discretionary conduct.
 
 
 205
 It is equally clear from the Sterling v. Constantin opinion that in no case is the permitted range of honest judgment free from objective limitations. Rather, when presented with allegations that state officials, in their efforts to quell a disorder or insurrection, have deprived persons of their constitutional rights through actions which were not justified by the exigencies of the situation, the courts can and must ascertain "the allowable limits of military discretion, and whether or not they have been overstepped in a particular case. . . . There is no ground for the conclusion that military orders in the case of insurrection have any higher sanction or confer any greater immunity." 287 U.S. at 401, 53 S.Ct. at 196.
 
 
 206
 I thus find that the Supreme Court's decision in Sterling v. Constantin requires two levels of inquiry in suits to redress deprivations of constitutional rights by state officials whose actions are shown to have been directly related to the quelling of civil disorders or insurrections.[12] Initially the court[13] must review the circumstances surrounding any asserted deprivation of constitutional rights and determine if the conduct causing those asserted deprivations fell within the range of discretionary measures which were justified by the exigencies of the situation.
 
 
 207
 Precise standards, of course, cannot be prescribed as guides in defining the parameters of this range of discretion in any given case. Certainly the use of lethal force could seldom, if ever, fall within the range of permitted actions in the face of nothing more than a nonviolent sit-in or a peaceful protest march. At the other extreme, open violence and actual threats to human life would seemingly justify a broad range of discretionary actions, including the use of lethal force in some situations. Ultimately, "'[e]very case must depend on its own circumstances."' Sterling v. Constantin, 287 U.S. at 401, 53 S.Ct. at 196.
 
 
 208
 If it is determined that the conduct of any state official was outside the range of justified actions, that official will be personally liable for any deprivations of rights resulting from his action, notwithstanding any asserted good faith or honest belief in the justification for his action. Alternatively, if it is determined that the conduct of any state officials was within the range of actions justified by the circumstances, under Moyer v. Peabody the second level of judicial review of that conduct must be restricted to the narrow question of the officials' "good faith and honest belief" that the actions were necessary to quell the disorder.
 
 
 209
 Personal liability will accompany any actions which, although adjudged to have been within the range of permitted conduct, are proven to have been undertaken in bad faith and/or without an honest belief that they were necessary to quell the disorder or prevent its continuance. This test, as prescribed in Moyer v. Peabody, is necessarily subjective, and the burden of proving the absence of good faith and an honest belief in necessity is therefore a difficult one in any case.
 
 
 210
 Beyond an inquiry into any allegations of bad faith and/or an absence of honest belief in necessity, a court cannot review any conduct which it has found to be within the range of actions justified under the circumstances. If the action taken was within the range of permitted measures, a court cannot review asserted errors in judgment nor consider whether a more prudent course of action might have been chosen. Rather, choices between alternative courses of action within the permitted range must be left solely to the discretion of the state officials. "[W]ithout such liberty to make immediate decisions, the power [of state officials to maintain peace] would be useless." Sterling v. Constantin, supra, 287 U.S. at 399-400, 53 S.Ct. at 196.
 
 
 211
 I would remand the present Section 1983 suits for findings of fact respecting the nature of the alleged actions of Defendants-Appellees. As to any such actions which might be shown to have been directly related to the quelling of a civil disorder or insurrection, the trier of fact would be required to determine whether those actions fell within the permitted range of discretionary measures which were justified by the exigencies of the situation and whether those actions were undertaken in good faith and in the honest belief that they were necessary to quell the disorder.
 
 V.
 
 212
 I now turn to consider the state law, wrongful death actions which, in addition to the claims under 42 U.S.C. Sec. 1983, are asserted in each of the complaints.
 
 
 213
 Federal jurisdiction over the wrongful death actions in the Krause and Miller suits is based on diversity of citizenship, 28 U.S.C. Sec. 1332.[14] The Plaintiff-Appellant in the Scheuer suit, being a resident of Ohio, asserts her wrongful death action under the doctrine of pendent jurisdiction.
 
 
 214
 The District Court made no reference to the wrongful death actions, and the majority herein fails to discuss these actions, all three of which it erroneously characterizes as having been asserted under the doctrine of pendent jurisdiction. Although entertainment of the pendent claim in the Scheuer complaint rested upon the District Court's discretion in the interest of judicial economy, convenience, and fairness to the parties, United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the wrongful death claims asserted in the Krause and Miller complaints were necessarily before the District Court under its original, diversity jurisdiction. It is therefore necessary to consider whether the wrongful death actions asserted in the Krause and Miller complaints are barred by the Eleventh Amendment and/or the common law doctrine of executive or personal immunity espoused by the majority herein.
 
 
 215
 I have concluded in Part II above that the claims under Section 1983 are not suits against the State of Ohio, so as to invoke the prohibition of the Eleventh Amendment. For purposes of the Eleventh Amendment's prohibition, the wrongful death actions are distinguishable from the Section 1983 claims only in that the former do not seek redress under a federal statute for an alleged deprivation of constitutional rights. Notwithstanding this distinction, the wrongful death actions are not suits against the State of Ohio so as to be barred by the Eleventh Amendment.
 
 
 216
 Although the Supreme Court's decision in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), dealt with a suit in equity to enjoin a state official's execution of an assertedly unconstitutional statute, the Court's review of the scope of the Eleventh Amendment was not confined to suits seeking to vindicate the plaintiff's constitutional rights against state interference. As discussed in Part II above, as of 1908 the Eleventh Amendment had been construed as barring suits by a citizen against a state as a named defendant, against a state official for monies from a state's treasury, and against a state official when the requested relief would require specific performance of a contract by the state. See Ex parte Young, supra, 209 U.S. at 150-152, 28 S.Ct. 441.
 
 
 217
 Since the Supreme Court's discussion in Ex parte Young, the scope of the Eleventh Amendment has not been expanded so as to encompass the present wrongful death actions. See generally Mathis, The Eleventh Amendment: Adoption and Interpretation, 2 Ga.L. Rev. 207, 230-34 (Winter 1968). Irrespective of whether a citizen's suit asserts a constitutional claim, the test under the Eleventh Amendment has consistently been whether a state is a "real, substantial party in interest." Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945). See also In re Ayers, 123 U.S. 443, 88 S.Ct. 164, 31 L.Ed. 216 (1887). Moreover, the Supreme Court has consistently noted that the Amendment presents no bar to a citizen's suit against a state official, individually, for his wrongful acts. See Ford Motor Co. v. Department of Treasury, supra, 323 U.S. at 462, 65 S.Ct. 347; Great Northern Ins. Co. v. Read, 322 U.S. 47, 51, 64 S.Ct. 873, 88 L.Ed. 1121 (1943) (quoted in Part II of this dissent).
 
 
 218
 The present wrongful death actions seek damages from the named defendants through their personal liability, as do the Section 1983 counterparts. They do not name the State of Ohio as a defendant; they do not seek monies from the State's treasury; they do not seek any type of relief under a contract with the State; nor does the State of Ohio have any cognizable interest in these actions which could render it a real party in interest.
 
 
 219
 I therefore would hold that the wrongful death actions asserted in the three complaints-like their Section 1983 counterparts-are not suits against the State so as to invoke the Eleventh Amendment's prohibition.
 
 
 220
 Unlike the scope of the Eleventh Amendment and the applicability of doctrines of personal or executive immunity under Section 1983, the question of whether the wrongful death actions are barred by the Defendants-Appellees' personal immunity is governed by Ohio law. See Carter v. Carlson, 447 F.2d 358, 361-365 (D.C.Cir.1971), cert. granted sub nom. District of Columbia v. Carter, 404 U.S. 1014, 92 S.Ct. 683, 30 L.Ed. 2d 661 (1972) (applying local, common law rules of immunity to common law tort actions, but rejecting the applicability of these rules to claims under Section 1983). Cf. Roberts v. Williams, 456 F.2d 819, 830 (5th Cir.) cert. denied, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971) (applying state law in finding no liability under pendent, state law claims, but relying on federal case law in finding liability under Section 1983).
 
 
 221
 With respect to the personal, civil liability of its officials in the performance of their duties, Ohio has adopted the common law distinction between discretionary and ministerial functions and recognizes a limited immunity for officials acting within the former context. It is established in Ohio that a public official is individually liable for negligence in performing a ministerial function, but a public official, acting within the scope of his authority and in the absence of bad faith or a corrupt motive, is not individually liable for his failure to properly perform a duty involving judgment and discretion. Gregory v. Small, 39 Ohio St. 346 (1883); Thomas v. Wilton, 40 Ohio St. 516 (1884). See cases cited 44 Ohio Jur.2d 570, n. 18.
 
 
 222
 It is clear from the complaints that the alleged actions of Governor Rhodes and President White involve the exercise of judgment and discretion within the above rule. Thus it is alleged that Governor Rhodes unnecessarily ordered the National Guard troops to duty on the Kent State Campus, permitted the troops to carry loaded weapons, permitted the troops to shoot at persons without justification, and ordered the troops to break up all assemblies, whether lawful or unlawful, and that President White failed to take any actions to control the National Guard troops on the Kent State Campus or to decrease the risk of injury and death. These actions or inactions appear to be inherently discretionary, requiring the judgment of the respective Defendants-Appellees.
 
 
 223
 It is further alleged, however, that the conduct of all Defendants-Appellees was intentional, willful, wanton, and reckless. These allegations, if proven, would establish the bad faith and/or corrupt motive necessary to remove the above-named Defendants-Appellees from the official immunity which would otherwise protect them from personal liability for their discretionary acts. Although the burden upon Plaintiffs-Appellants in proving the latter allegations would have been difficult, the District Court heard no evidence respecting these allegations and therefore could not properly dismiss the wrongful death actions as against these Defendants-Appellees.
 
 
 224
 With respect to Adjutant General Del Corso and Assistant Adjutant General Canterbury, the complaints allege that these Defendants-Appellees intentionally, willfully, wantonly, and recklessly caused and ordered inadequately trained and incapable National Guard troops to carry loaded weapons, to shoot at persons without legal justification, and to engage in actions which increased the risk of injury and death to persons on or near the campus. Beyond the generality of the last clause, these alleged actions similarly appear to be discretionary in nature, so as to invoke the limited common law immunity recognized for such actions. Again, however, the District Court could not properly dismiss the wrongful death actions as against these Defendants-Appellees without receiving evidence respecting the allegations of bad faith and/or corrupt motive, which, if proven, would remove these parties from the common law immunity.
 
 
 225
 From the complaints alone, however, it is not clear whether the alleged actions of Defendants-Appellees Del Corso and Canterbury are asserted to have taken place at the scene of the disturbances on the Kent State Campus or, alternatively, whether the alleged acts of these Defendants-Appellees assertedly took place at some point away from the scene of those disturbances. Whereas the limited common law immunity discussed above may be applicable to these Defendants-Appellees for any discretionary acts in the latter context, any actions in the former context would invoke the limited statutory immunity which the Ohio Legislature has expressly provided in O.R.C. Sec. 5923.37:
 
 
 226
 "When a member of the organized militia is ordered to duty by state authority during a time of public danger, he is not answerable in a civil suit for any act performed within the scope of his military duties at the scene of any disorder within said designated area unless the act is one of willful or wanton misconduct."[15]
 
 
 227
 From the clear language of the statute, it appears that the legislature intended to afford this limited immunity to all members of the organized militia, regardless of rank, so long as their actions fall within the terms of the statute. Therefore, if it had been established that Defendants-Appellees Del Corso and Canterbury engaged in acts encompassed by the terms of O.R.C. Sec. 5923.37, that statute, rather than the common law immunity described above, would have governed the question of their potential liability for those acts. As clearly prescribed by O.R.C. Sec. 5923.37, liability would have rested for acts encompassed therein only if Plaintiffs-Appellants had been able to prove their allegations that the asserted conduct of Defendants-Appellees Del Corso and Canterbury was willful and wanton.
 
 
 228
 The alleged actions of Major Jones, Captains Martin and Srp, and the unnamed National Guardsmen[16] appear to have assertedly taken place at the scene of the Kent State disturbances, within the terms of O.R.C. Sec. 5923.37, as discussed above. Thus, it is alleged that Major Jones and Captains Martin and Srp intentionally, willfully, wantonly, and recklessly caused and ordered National Guard troops to shoot at and in the direction of persons without justification, or, alternatively, failed to restrain the troops under their command. It is alleged that the unnamed members of the National Guard intentionally, willfully, wantonly, and recklessly shot at and in the direction of persons on the Kent State Campus or, alternatively, if so ordered to shoot, that such orders were patently unjustified and illegal. Without having heard evidence respecting the allegations of intentional, willful, and wanton misconduct, the District Court could not properly dismiss the wrongful death actions as against these Defendants-Appellees.
 
 
 229
 I therefore believe that the District Court erred in dismissing the wrongful death actions set forth in the Krause and Miller complaints, which were before the Court under its original, diversity jurisdiction. These actions are not barred by the Eleventh Amendment. Moreover, the complaints sufficiently allege conduct which, if proven, would remove the respective Defendants-Appellees from the common law and statutory immunities which might otherwise bar the wrongful death actions.
 
 VI.
 
 230
 One aspect of the alleged conduct of Defendant-Appellee Governor Rhodes warrants special comment. Among the alleged actions of Governor Rhodes for which redress is sought in his ordering the National Guard troops to duty on the Kent State Campus when such action was unnecessary. The Supreme Court has consistently ruled that the executive decision to call up the militia is conclusive and, in and of itself, is not subject to judicial review. This rule was reaffirmed in Sterling v. Constantin, 287 U. S. 378, 399, 53 S.Ct. 190, 77 L.Ed. 375 (1932), notwithstanding the Supreme Court's review of the actions of the Governor and National Guard subsequent to the call-up in that case. See Part IV of this dissent. With respect to the Section 1983 claims, Governor Rhodes' decision to order the National Guard to duty on the Kent State Campus therefore could not have been reviewed as a basis for liability. See Morgan v. Rhodes, 456 F.2d 608, 610-611 (6th Cir. 1972), cert. granted sub nom., Gilligan v. Morgan, 409 U.S. 947, 93 S.Ct. 287, 34 L.Ed.2d 217 (U.S. Oct. 24, 1972). This deference which must be given to the Governor's decision to call up the Guard did not, however, preclude judicial review of his ancillary and subsequent conduct alleged in the complaints as a basis for liability under the statute. See Sterling v. Constantin, supra, 287 U.S. at 398-401, 53 S.Ct. 190; Morgan v. Rhodes, supra, 456 F.2d at 612-613.
 
 
 231
 For the reasons set forth in this dissent, I would reverse the ruling of the District Court and remand the suits for further proceedings.
 
 
 
 [1]
 Plaintiff Krause filed a similar suit against the State of Ohio in the Court of Common Pleas of Cuyahoga County, Ohio, which was dismissed on the ground of sovereign immunity. On appeal a divided Appellate Court reversed the Common Pleas Court and held that the State was amenable to suit and that the individual officers of the State had immunity. Krause v. State, 28 Ohio App.2d 1, 274 N.E.2d 321 (1971). In so holding the State Appellate Court did not follow a long line of decisions of the Supreme Court of Ohio, going back as far as 1840. Certiorari was granted by the Supreme Court of Ohio, and on July 19, 1972, the Supreme Court of Ohio reversed the Appellate Court, and held:
 "The state of Ohio is not subject to suits in tort in the courts of this state without the consent of the General Assembly." (Syl. 1) (Krause, Admr., Appellee v. State of Ohio, Appellant, 31 Ohio St.2d 132, 285 N.E.2d 736 (1972) certiorari pending).
 In a concurring opinion Justice Corrigan sharply criticized the Appellate Court for flouting the Supreme Court of Ohio opinions.
 
 
 [2]
 As well stated by Mr. Justice White, "The most basic function of any government is to provide for the security of the individual and of his property." Miranda v. Arizona, 384 U.S. 436, 539, 86 S.Ct. 1602, 1661, 16 L.Ed.2d 694 (1966), White, J., dissenting
 
 
 [3]
 While the Civil Rights Act (Sec. 1983) was recently held to be within an exception to the anti-injunction statute (28 U.S.C. Sec. 2283) forbidding federal courts from issuing injunctions against state courts, Mitchum v. Foster, 407 U.S. 225, 92 S. Ct. 2151, 32 L.Ed.2d 705 (1972), the Eleventh Amendment contains no exceptions. We ought not to engraft an exception on the Amendment by judicial construction
 
 
 [4]
 In Martone v. McKeithen, 413 F.2d 1373 (5th Cir. 1969), the Court, relying on Barr v. Matteo, supra, and Gregoire v. Biddle, supra, held that the Governor of the state has immunity from damage suits for acts within the sphere of executive activity; that the members of the Labor-Management Commission and four investigators on its staff had legislative immunity; and the grand jurors had judicial immunity. Officials of the Department of Justice also have immunity. Norton v. McShane, 332 F.2d 855 (5th Cir. 1964). Allegations of malice are not sufficient to prevent the application of executive immunity. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), is authority for the proposition that Section 1983 does not abolish the immunity of public officers from suit
 "1. The potential effectiveness of this sanction is evidenced by the fact that '[t]he Federal Government pays for 90 percent of the operating costs, virtually all of the equipment, and nearly half of the cost of the physical installations and facilities' of the National Guard. Report of the National Advisory Commission on Civil Disorders at 498 (Bantam ed. 1968)."
 
 
 [5]
 Presidents have called out troops to suppress disorders, enforce orders of the federal courts and even to prevent disorders at political conventions. It could hardly be maintained that the President of the United States is not protected with Executive immunity. (Footnote ours.)
 
 
 [1]
 82 Harvard Law Review 1486 (1969)
 
 
 [2]
 Younger, State v. Uncle Sam, 58 A.B.A.J. 155 (1972)
 
 
 [1]
 The District Court also cited Fitts v. McGhee, 172 U.S. 516, 19 S.Ct. 269, 43 L.Ed. 535 (1899), in support of its application of the Eleventh Amendment. As noted by the Supreme Court in Ex parte Young, supra, 209 U.S. at 156-157, 28 S.Ct. 441, 52 L.Ed. 714, however, the Fitts decision rested upon the plaintiff's invalid attempt to test the constitutionality of a state statute by naming as defendants state officials who had no power to enforce the statute in question
 
 
 [2]
 The question of whether common law immunities are applicable to suits under Section 1983 is, of course, governed by federal or general common law rather than state law. Nelson v. Knox, 256 F.2d 312, 314 (6th Cir. 1958). In contrast to Part V of this dissent, which deals with the state law wrongful death actions, the present discussion does not require that we look to the common law and statutory immunities which Ohio might afford to Defendants-Appellees
 
 
 [3]
 Significantly, the Martone Court remanded the case for further proceedings on the appellant's claim for injunctive relief against all defendants. That Court was thus of the view that the immunities which it broadly applied barred only suits for damages under Section 1983. In Nelson v. Knox, 256 F.2d 312, 314-315 (6th Cir. 1956), this Court expressly rejected such a dicotomy between injunctive relief and damages with respect to immunity under Section 1983:
 "To be sure, the present action is one for money damages rather than an injunction, but that difference does not affect the question of immunity. Indeed, the Supreme Court has pointed out that under the Civil Rights Act relief in equity should sometimes be withheld even where 'comparable facts would create a cause of action for damages.' Stefanelli v. Minard, 1951, 342 U.S. 117, at page 122, 72 S.Ct. 118, 121, 96 L.Ed. 138; see Williams v. Dalton, 6 Cir., 1956, 231 F.2d 646, 649; Cobb v. City of Malden, 1 Cir., 1953, 202 F.2d 701, 704-705." 256 F.2d at 314-315.
 Compare Giles v. Harris, 189 U.S. 475, 23 S.Ct. 639, 47 L.Ed. 909 (1903), with Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). Cf. Sterling v. Constantin, 287 U.S. 378, 403, 53 S.Ct. 190, 77 L.Ed. 375 (1932).
 
 
 [4]
 The Gregoire Court did allude to Pickering v. Pennsylvania R. R. Co., 151 F.2d 240 (3d Cir. 1945), holding that absolute official immunity does not apply to actions under Section 1983, but found it unnecessary to consider this point. 177 F.2d at 581-582
 
 
 [5]
 The District Court had found the superintendent of the county farm liable in damages under both Section 1983 and state common law. 302 F.Supp. 972 (N.D.Miss.1969). On appeal, the superintendent simply challenged the sufficiency of the evidence to support this judgment, and he did not assert that either action was barred by his official immunity. The Court of Appeals affirmed the judgment against him under both the federal and common law claims
 
 
 [6]
 The Court of Appeals did ultimately affirm the dismissal of the Section 1983 action against the board members because no breach of duty or nonfeasance on their part had a causal relation to the plaintiff's injuries-but not because the board members were immune from suit
 
 
 [7]
 But see Bivens v. Six Unknown Named Agents of the F. B. I., 456 F.2d 1339 (2d Cir. 1972) where the same Court of Appeals refused to recognize the immunity of F.B.I. agents from damage suits for their allegedly unreasonable search and unlawful arrest
 
 
 [8]
 Judge Bazelon of the District of Columbia Circuit has emphasized this point in questioning the need for various doctrines of immunity in the context of common law suits. He suggests that the degree of discretion required in the performance of official duties should bear solely on the question of ultimate liability, and need not be raised as a bar to the suit. The substantive law of torts, rather than broad rules of immunity, can adequately protect public officials from liability for conduct which was reasonable under the circumstances. Carter v. Carlson, supra, 447 F.2d at 364, n. 15
 
 
 [9]
 The parties in Moyer v. Peabody had agreed that the record of the proceedings on Moyer's earlier petition for a writ of habeas corpus in the Supreme Court of Colorado would be made part of the complaint before the federal Circuit Court. The existence of an insurrection and the Governor's good faith were established in this record and therefore were not at issue before the latter Court. 212 U.S. at 84, 29 S.Ct. 235
 
 
 [10]
 Prior to its entry of the permanent injunction against the Governor and National Guard officers, the three-judge District Court in Sterling had conducted a full evidentiary hearing on the merits of the plaintiffs' claims. The Governor and a National Guard General testified that their "orders had not been issued for the purpose of affecting prices, nor even per se to limit production, but 'as acts of military necessity to suppress actually threatened war' as they believed from reports brought to them that 'unless they kept the production of oil down to within 400,000 barrels, a warlike riot or insurrection, in effect a state of war, would ensue.' . . ." 287 U.S. at 391, 53 S.Ct. at 193. The District Court, however, proceeded to make the following findings from the evidence before it: "'We find no warrant in the evidence for such belief. Looking at it in the light most favorable to defendants' contention, it presents nothing more than threats of violence or breaches of the peace. . . . It shows that at no time has there been in fact any condition resembling a state of war, and that, unless the Governor may by proclamation create an irrebuttable presumption that a state of war exists, the actions of the Governor and his staff may not be justified on the ground of military necessity."' 287 U.S. at 391-392, 53 S.Ct. at 193
 
 
 [11]
 As discussed in Part VI of this dissent, the Sterling Court expressly ruled that the Governor's decision to call up the National Guard is conclusive and, in and of itself, is not subject to judicial review. See 287 U.S. at 399, 53 S.Ct. 190
 
 
 [12]
 State officials are afforded a permitted range of good faith, discretionary measures only in the context of actions "in the face of the emergency, and directly related to the quelling of the disorder or the prevention of its continuance." Sterling v. Constantin, 287 U.S. at 400, 53 S.Ct. at 196. As to any conduct which is not shown to have been directly related to the quelling of a disorder, liability under Section 1983 must be governed by general principles of tort liability. See Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)
 
 
 [13]
 For convenience, I refer to the trier of fact as the court throughout this discussion. Both levels of inquiry discussed in the text relate to questions of fact which must be resolved by the trier of fact, be it the court or the jury working under appropriate instructions from the court
 
 
 [14]
 The Krause and Miller complaints state that the plaintiffs therein are residents of Pennsylvania and New York, respectively. The Krause complaint expressly invokes federal diversity jurisdiction over the wrongful death claims under 28 U.S.C. Sec. 1332. While specifically referring only to jurisdiction under 28 U.S.C. Secs. 1331 and 1343, the Miller complaint alleges facts which clearly support diversity jurisdiction over the wrongful death action therein
 
 
 [15]
 O.R.C. Sec. 5923.37 became effective September 1, 1967, along with its companion statute, O.R.C. Sec. 5923.36, establishing a 2-year statute of limitations for any civil suit against a member of the organized militia alleging willful and wanton misconduct in actions described in Sec. 5923.37. I am aware of no decisions which have applied either statute, and no legislative history is available
 
 
 [16]
 As initially noted in this dissent, the Krause complaint names only Governor Rhodes, Adjutant General Del Corso, and Assistant Adjutant General Canterbury as defendants. As additional defendants, the Miller and Scheuer complaints name the parties referred to in the text. The Miller complaint alone names Alexander Stevenson as yet another defendant. Although the Miller complaint does not allege acts of Stevenson individually, it appears that his immunity, if any, should have been governed by the present considerations in the text
 Ultimate determination of the applicability of common law and statutory immunities to each of the named and unnamed members of the National Guard, including Defendants-Appellees Del Corso and Canterbury, should have rested upon evidence introduced during further proceedings in the District Court.